## COURT OF APPEALS,

### Sept., 1908.

## THE PEOPLE v. ANDREA DEL VERMO.

(192 N. Y. 470.)

(1). MURDER—EVIDENCE—TESTIMONY AS TO FINDING OF WEAPON AT PLACE WHERE DEFENDANT HAD BEEN, SHORTLY AFTER HOMICIDE—WHEN PROPERLY ADMITTED.

It is not erroneous, upon the trial of a defendant charged with murder in the first degree, committed by stabbing the decedent with a knife, to admit evidence that about two weeks after the commission of the crime a knife was found, through the instrumentality of a friend of the defendant, at a place where the latter is admitted to have been the day after the crime was committed, which knife was disposed of by the friend in such a way as to render its recovery impossible, where the knife was shown to have corresponded in pattern and character with one which several witnesses had actually seen in the hands of the defendant at different times prior to the murder.

(2). SAME—NOT ERRONEOUS TO PERMIT MODEL OF KNIFE, BY WHICH CRIME WAS ALLEGED TO HAVE BEEN COMMITTED, TO BE USED AS EXHIBIT ON TRIAL.

Nor is it erroneous to permit a knife to be used as an exhibit and as a model of the knife alleged to have been owned and possessed by the defendant, where its similarity to the original was vouched for by several witnesses, who swore that it was like the knife which they had seen in the hands of the defendant, and a witness, who testified to the finding of a knife at a place where defendant had been shortly after the homicide, declared that the knife which he found was similar to the exhibit.

(3). SAME—SPONTANEOUS EXCLAMATIONS—STATEMENT OF DECEASED, MADE
IMMEDIATELY AFTER INJURY—WHEN ADMISSIBLE IN EVIDENCE.

Evidence of a statement of the deceased, made immediately after he
was wounded, to the effect that the defendant had stabbed him, is ad-
missible, where the declaration appears to have been made impulsively
and as an instinctive outcome of the act, even though subsequent in
time to the infliction of the injury. Under the exception to the gen-
eral rule excluding hearsay evidence, proof of such exclamations is.
admissible if they are spontaneously expressive of the injured person's.
observation of the effects of a startling occurrence and the utterance
is made within such limit of time as presumably to preclude fabrica-
tion.

(4). SAME—DYING DECLARATIONS—PRELIMINARY PROOF SUFFICIENT TO
JUSTIFY THEIR RECEPTION IN EVIDENCE.

Statements made by the deceased, as to the identity of his assailant,
are properly admitted in evidence as dying declarations, where it
appears that they were made in conjunction with numerous declara-
tions of the deceased to the effect that he was about to die and the
proof presents a picture of a man actually dying whose utterances were
spoken under a sense of impending death and without hope of recovery,
since such evidence constitutes a sufficient foundation for the admission
of his statements. While the prosecution must show that the deceased
was in actual danger of death and had given up all hope of recovery
at the time when his declarations were made, that fact may be proved
like any other, and can be inferred from the existing and surrounding
circumstances.

(5). SAME—ADMISSION OF EVIDENCE AS TO QUARRELS OF DEFENDANT WITH
THIRD PERSONS BEFORE THE HOMICIDE.

Evidence having been properly introduced by the prosecution, as to
certain quarrels which occurred between the defendant and the de-
ceased prior to the homicide, it is not error to admit evidence as to
disputes occurring at or about the same time between the defendant
and third persons, where the incidents are so connected that it is diffi-
cult to present an account of one of them to the jury without disclos-
ing something about the others; and, especially, where it is impos-
sible to perceive how the latter testimony could have possibly injured
the defendant.

(6). SAME—PREMEDITATION AND DELIBERATION—SUFFICIENCY OF EVIDENCE.

The evidence as to premeditation and deliberation, examined and,
although meagre on the subject of motive, held sufficient to warrant
the submission of the question to the jury and to sustain a verdict of
conviction.

(Argued June 2, 1908; decided September 29, 1908.)

APPEAL from a judgment of the Supreme Court, rendered January 28, 1907, at a Trial Term for the county of Oneida upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*John E. Mason,* for appellant. The verdict of murder in the first degree, as charged in the indictment, was strongly against the weight of the evidence. (*People v. Cascone,* 185 N. Y. 317; *People v. Gallo,* 149 N. Y. 106; *People v. Carbone,* 156 N. Y. 413.) The evidence in this case, even as given by Bochicecheo, fails to show any facts from which the jury could properly have found premeditation and deliberation. On the contrary, the facts of the transaction negative that conclusion. (*People v. Mangano,* 29 Hun, 259, *Manuel v. People,* 48 Barb. 548; *People v. Raffo,* 180 N. Y. 434.) The reception of evidence showing trouble between the defendant and third persons not in any way involving the deceased, and of evidence proving specific acts of wrongdoing by the defendant not suitable to test the credibility of the witness and not pertinent to the issue, was error. (*People v. Loomis,* 178 N. Y. 400; *People v. Crapo,* 76 N. Y. 288; *People v. Stephenson,* 91 Hun, 613; *People v. Gibson,* 6 N. Y. Cr. Rep. 390; *Coleman v. People,* 55 N. Y. 81; *People v. Larubia,* 140 N. Y. 87; *People v. Sharp,* 107 N. Y. 456; *People v. Fitzgerald,* 156 N. Y. 253; *People v. Mitchell,* 100 Cal. 329; *Bird v. United States,* 180 U. S. 356; *McCarthy v. People,* 51 Ill. 231.) The admission of the evidence offered as to the alleged dying declarations of the deceased was error. (*People v. Smith,* 104 N. Y. 491; *People v. Chase,* 79 Hun, 296, 143 N. Y. 669; *People v. Brecht,* 120 N. Y. 769; *People v. Evans,* 40 Hun, 492; *Reg. v. Nichols,* 5 Cox C. C. 120; *Mathedy v. Comm.,* 19 S. W. Rep. 977; *People v. Kraft,* 148 N. Y. 631; *People v. Conklin,* 175 N. Y. 333; *Shaw v. People,*

3 Hun, 272.) The reception of evidence relating to a knife found at Greenway and the reception in evidence of a knife concededly having no connection with the tragedy was prejudicial error. (*People v. Shaw,* 63 N. Y. 36; *People v. Corey,* 148 N. Y. 146; *People v. Hill,* 123 Cal. 571; *State v. Tippett,* 94 Iowa, 646; *Herman v. State,* 75 Miss. 340; *People v. Yee Fook Dies,* 106 Cal. 163; *State v. Hossock,* 116 Iowa, 194; *State v. Cadotte,* 17 Mont. 315; *Butez v. Fonda,* 29 Misc. Rep. 123; *Ross v. B. H. R. R. Co.,* 10 App. Div. 477; *Clark v. B. H. R. R. Co.,* 177 N. Y. 359.)

*Emerson M. Willis, District Attorney,* for respondent. The verdict of murder in the first degree is warranted by the evidence. (*People v. Conroy,* 97 N. Y. 62, 77; *People v. McKee,* 36 N. Y. 113; *People v. Thomas,* 67 N. Y. 224; *People v. Fish,* 125 N. Y. 154; *People v. Ferraro,* 161 N. Y. 374; *People v. Majone,* 91 N. Y. 211; *People v. Burton,* 77 Hun, 498; *People v. Strollo,* 191 N. Y. 42; *People v. Gallo,* 149 N. Y. 106; *People v. Carbone,* 156 N. Y. 413.) Premeditation and deliberation is found in the evidence. (*People v. Ferraro,* 161 N. Y. 374; *People v. Conroy,* 97 N. Y. 62.) The reception of evidence as to what took place in Dan Page's saloon during the card game between the defendant on the one side and deceased and Bochicecheo on the other was competent on the question of the condition of defendant's mind when the incidents began which led up to the homicide. (*People v. Burton,* 77 Hun, 498; *People v. Majone,* 91 N. Y. 211; *People v. Johnson,* 185 N. Y. 219; *People v. Ferraro,* 161 N. Y. 365; Abb. Cr. Tr. Brief (2d ed.), 551; *People v. Casey,* 72 N. Y. 393; *People v. McCormick,* 135 N. Y. 663; *People v. Irving,* 95 N. Y. 541.) The statement made by the deceased, as he fell to the ground from the effects of the mortal wound inflicted upon him by the defendant, " Del Vermo stabbed me with a knife," was competent evidence. It was coincident with and

a part of the tragedy. (*Casey v. N. Y. C. & H. R. R. R. Co.,* 78 N. Y. 518; *Waldele v. N. Y. C. & H. R. R. R. Co.,* 95 N. Y. 284; *State v. Arnold,* 35 N. C. 184; *Reg. v. Foster,* 6 C. & P. 325; *Kennedy v. R., C. & B. R. R. Co.,* 130 N. Y. 656; *Hagenlocher v. C. I. & B. R. R. Co.,* 99 N. Y. 136; *People v. Smith,* 104 N. Y. 493; *People v. Chase,* 79 Hun, 296; *People v. Brecht,* 120 App. Div. 769; *Pitts v. State,* 140 Ala. 70; *Milton v. State,* 134 Ala. 42.) The testimony concerning the knife found at Greenway and disposed of by Telesco was proper for the jury's consideration. (*People v. Smith,* 172 N. Y. 210; *People v. Neufeld,* 165 N. Y. 43; 2 Am. & Eng. Ency. of Law (2d ed.), 593; *Earl v. Lefler,* 46 Hun, 9; *Donohue v. Whitney,* 133 N. Y. 178; 1 Wigmore on Ev., § 791; *People v. Searcy,* 121 Cal. 1; *People v. Maughs,* 86 Pac. Rep. 187; *Davis v. Power Co.,* 107 Cal. 563; *Chicago O. & R. Co. v. Walker,* 217 Ill. 605.)

WILLARD BARTLETT, J.:

The indictment in this case charged the defendant with the crime of murder in the first degree committed at the city of Rome, in Oneida county, on the 30th day of June, 1906, upon the body of one Tony Page by means of a knife, with which a fatal stab wound was inflicted in the abdomen, causing the death of the victim on the following day. The defendant pleaded not guilty and testified as a witness in his own behalf, denying the infliction by him of any stab wound whatever upon the body of the deceased and giving evidence which, if it had been believed by the jury, would have led them to the conclusion that the injury which caused the death of Tony Page was self-inflicted by means of a knife with which Page had endeavored to assault the defendant.

The defendant and the deceased were Italian laborers residing in the city of Rome, the defendant being about twenty-four years of age and the deceased thirty-six years old. They were

acquaintances and early on the evening of the 30th of June, 1906, met in a liquor saloon occupied by Daniel Page, a brother of the deceased. There they participated to some extent with other Italian acquaintances in a number of games of cards. It seems that as the result of each game the winner was denominated the " boss " of the game and became entitled to take such glasses of beer or sherry or such cigars as might constitute the stake. These he was at liberty to appropriate wholly to himself or he might share them with the other players if so disposed. When a game of this sort was going on an outsider who had not shared in the play might be permitted to come in by paying five cents, and he thereby became equally entitled with the players to take the winnings if thus favored by the turn of the cards. On the evening in question four men, Canio Sabia, Paul Telesco, Joseph Bochicecheo and Tony Page, were engaged in playing this game in Daniel Page's saloon. Whilst the first game was being played the defendant came in and " chipped in a nickel." Sabia was the winner and drank all the beer himself except one glass, which he gave to Telesco. The defendant participated in the same way in the two following games, one of which he won, while Tony Page was the winner of the other. When the defendant won he omitted to offer Tony Page any of the beer which was served, whereupon Tony Page imitated his example in the succeeding game, and the defendant said to him: " Why didn't you give me a drink? You have got to respect me." Tony Page responded: " Well, you left me dry before; I will let you go dry this time." Evidence as to this occurrence was introduced by the prosecution to show that bad feeling had arisen between the defendant and the deceased before the tragedy. There was proof also that Bochicecheo, a youth of nineteen, who was a nephew of the wife of Daniel Page, the keeper of the saloon, had engaged in an altercation with the defendant during one of these games of cards.

Bochicecheo had objected to the participation of the defendant, declaring that he did not want him in the game any more, and when the defendant asked him why, he had answered: "Because you are going to get in trouble with Tony." The defendant thereupon invited Bochicecheo to go out into the street and settle the controversy, when Mrs. Page appeared and composed the difficulty for the time being. The defendant, with Sabia and Paul Telesco, left the saloon at about ten o'clock. Bochicecheo remained fifteen or twenty minutes longer and then went out. He and the defendant were the only persons present at the time when Tony Page received his death wound, and the case for the people, therefore, depended largely upon the testimony of Bochicecheo.

According to Bochicecheo's statement he was walking homeward along Dominick street about a quarter of an hour after he left the saloon when he encountered the defendant standing on the front steps of a bakery. Bochicecheo did not speak to the defendant, but went straight by him. After he had gone about twenty-five feet the defendant called out: "Joe, wait a minute." Bochicecheo inquired of the defendant what he wanted and the defendant answered: "I am going to give you this to-night," and approached with a knife in his hand, adding, "I am going to kill you to-night." As the defendant approached Bochicecheo drew a revolver and exclaimed: "You son-of-a-gun, you had better go home and go to bed if you want to kill me! If you kill me I have got nobody. If I kill you I have got a brother and a sister." These remarks appear to have quieted the defendant, who responded: "That is all right; I have drank a little to-night," and he thereupon shut his knife and put it in his pocket, while Bochicecheo at the same time pocketed his revolver. The defendant then proposed that they should take a walk and they went together to a saloon where each treated the other to one drink. As they were about to leave this saloon Tony Page came in and had a drink at the

invitation of Bochicecheo. As they went out the defendant proposed that they should take a walk. Both the others acceded to the suggestion and all three started up Dominick street, Bochicecheo being on the inside of the walk, Tony Page in the middle and the defendant on the outside toward the street. As they proceeded on their midnight stroll Bochicecheo overheard the defendant say to Tony Page that he had had connection with Page's wife and was going to have connection again. " If you want to come and see," said the defendant, " I will go just right now." Tony Page responded with an opprobrious epithet, at which the defendant laughed, and they all walked on a distance of about two blocks further, when Bochicecheo saw the defendant start to run, and exclaimed: " What is the matter with that fellow ? " Tony Page responded: " Maybe he saw something about the store." As he said this he walked forward four or five steps and dropped to the sidewalk. Bochicecheo asked him, " What is the matter ? " and he answered, " Del Vermo stabbed me with a knife." Bochicecheo helped him into his home through the back yard, where his wife met him, and in response to her inquiry as to what was the matter he again said: " Del Vermo stabbed me with a knife." Page was then placed on a couch and a physician was summoned by telephone. The patient was found to be suffering from a stab wound in the abdomen, which was between seven and eight inches deep, and had penetrated the intestines, severed the mesentery artery and punctured the liver. He died as the result of this wound at three o'clock a. m. on July 1st, 1906.

The witness Bochicecheo, on cross-examination, adhered to his narrative on the direct without substantial variation. He denied that Tony Page struck the defendant on account of his boastful declaration in regard to his intimacy with Mrs. Page; but, on the other hand, he admitted that he had not actually seen the defendant strike the deceased with a knife or even seen him take the knife out of his pocket. It was not until

after the defendant started to run and the deceased declared that he had stabbed him with a knife that the witness realized that any assault had been committed. As to the immediate flight of the defendant, however, there is no doubt whatever, and the facts of the case will be rendered most intelligible by now taking up the defendant's story of the occurrence as narrated by him upon the witness stand. He admitted his participation in the card games at the saloon of Daniel Page early in the evening and that Tony Page had not given him any of the beer when he was the winner, but he denied that any trouble had ensued between them on that account or that they had indulged in any cross words toward one another on that occasion. He also admitted that he had had some words with Bochicecheo in the saloon, but professed ignorance as to whether or not the trouble was because Bochicecheo would not let him into the game. He described his meeting with Bochicecheo on Dominick street later in the evening as friendly, notwithstanding the trouble that had taken place between them in the saloon, and corroborated Bochicecheo in reference to the meeting with Tony Page and their starting out for a walk after drinking together in another saloon. According to his testimony, however, Tony Page was the aggressor in the conversation which immediately preceded the affray. They had been talking pleasantly about women, he said, when Tony suddenly accused the defendant of being unduly intimate with his wife, called him a son-of-a-bitch, and struck him with his fist upon the mouth. " He grabbed me by the neck," said the defendant, " and in his other hand he had a knife. I grabbed his two hands and stopped the knife. I did not strike him back." While the defendant was thus holding Tony Page, he declared that Bochicecheo came behind and grabbed him by the neck and all three tumbled down to the sidewalk together. Bochicecheo had a revolver. The defendant rose to his feet and started to run, when, according to his statement, Bochicecheo fired a shot at

him, at the same time crying out that he would kill him.  The defendant swore that he had no knife there before he started to run, he had no knife either in his pocket or in his hand, and that although he had not stabbed anybody or hurt anybody, he fled because he had been shot at and ran a mile and a half or two miles before he stopped.  Although he was not pursued he made no endeavor to go to his home, but went to sleep behind a fence.  He was now in the suburbs of Rome and the next morning he stopped at the house of a Mrs. Eldridge, who was a witness in the case, and there asked for something to eat. Later in the forenoon he says that he encountered two Italians whom he had never met before and who were out shooting, and that he spent the remainder of the day with them until about five o'clock, when he went to Greenway, a railroad station, and there took passage on a train for Schenectady.  He had a sister living in Schenectady, and he was arrested by the police authorities of that city just as he arrived at her house on the evening of the same day.

In support of the case for the prosecution evidence was offered to show the possession by the defendant of a knife capable of producing the wound which caused the death of the deceased and also proof of inculpatory admissions by the defendant after his arrest.  The evidence in respect to the knife will be considered more fully hereafter.  The principal admission was alleged to have been made to a police officer at the police headquarters in Schenectady.  The officer testified that he asked the defendant why he did not fight with his fists " and not shoot anybody ? "  The defendant said he didn't shoot, " he sticked him with a knife."  The witness said, " Well, he is dead now," to which remark the defendant responded that he was glad.  The witness said again, " Well, you will get the rope," and the defendant answered, " I don't give a God damn."  The same police officer further testified as follows: " I talked to him each time that I was down there that night

about Tony Page, and he asked me how we found it out so quick. I told him that we had a telephone and that we could talk to Rome in about a minute. He said, 'Me fool, me don't know that,' then he started pacing the cell." The other admission was testified to by an Italian acquainance of the defendant who saw him on the train when he was taken from Schenectady back to Rome. This witness told the defendant that he had done wrong to kill a man with a family, and according to his testimony the defendant answered: "I am sorry I did not kill the other one," but did not mention who the other one was.

To establish the possession of a knife by the defendant the prosecution called several witnesses. One of them was an Italian saloon keeper in Rome who had known the defendant about three years and saw him in his saloon attempting to clean his pipe with a knife about two months before the homicide. The blade of the knife was about seven or eight inches long and about an inch wide, the point of the blade being as sharp as a needle. There was a spring in the handle that held the blade open and it was necessary to press this spring in order to close the knife. The witness characterized the knife which he had thus seen in the defendant's hands as being similar in respect to the spring and the notches on the back of the blade to a knife which was introduced in evidence as a model for purposes of explanation and illustration. He said that this exhibit was a knife such as is manufactured in Italy and is known as an Italian knife. Two foremen employed in the Rome Seamless Tube Works testified that when the defendant worked there in May, 1906, another workman named Falvo brought a knife to one of them which had been picked up on the floor of the factory. This knife was claimed by the defendant and restored to him. He said he had lost it through a hole in his pocket and that he would sooner lose his job than to lose his knife. One of the witnesses thought the blade might have been five or six inches long and the other estimated the length of the blade

at about four inches, but the spring and notches were charac-
terized by the second witness as similar to those on the model
knife to which reference has already been made.   " The only
way I can describe to the jury the working of the spring and
the lock," said this witness, " is to say that you would have to
push back the spring with your thumb in order to close the
blade."   He further testified that he had seen several Italians
employed under him use knives of that kind to eat their food
with.

There was still further proof offered concerning the defend-
ant's possession of a knife, the admission of which is strongly
criticised by the learned counsel for the defendant on the
ground that it was too remote.   It will be remembered that the
defendant on the day following his flight took the cars for
Schenectady at a station named Greenway.   The district attor-
ney called a witness named Paul Telesco, whose wife was a
cousin of the defendant, and in whose family the defendant
lived up to the time of the homocide.   This Paul Telesco had
been at Daniel Page's saloon when the games of cards were
played, and he did not see the defendant after parting with
him on that evening until he got off the train at Rome when he
was brought from Schenectady under arrest.   About two weeks
later he went to Greenway, and there saw a Mr. Fred Sher-
wood, a section foreman, employed on the railroad there, who
knew the defendant, and had seen him at the station as he was
about to take the train for Schenectady.   There is no proof as
to what Telesco said to Sherwood, if anything, in regard to a
knife, but Telesco testified that after he had asked Sherwood
for some rubber boots that he had left at Greenway, Sherwood
went back of the depot and brought the witness a knife which
was in a bag.   The witness declared that he never looked at the
knife, but threw it away into the creek.   Sherwood was called
and corroborated Telesco's testimony as to the fact of his visit
and the finding of the knife, but not as to the disposition which

was made of it. After he had talked with Telesco, Sherwood said that the first thing he did was to go around to the water-closet, under the steps of which he found a knife in a paper sack, and he handed the knife to Telesco, who shut it up and put it in his pocket. There were dark stains on the paper bag and on the blade of the knife. The knife when closed was about nine or ten inches long, and was similar to the model in evidence, having the same kind of a spring.

As the admissibility of this evidence in regard to the finding of a knife at Greenway is the most serious legal question presented upon this appeal, I will consider it first. If objectionable at all, it is objectionable only on the ground of remoteness. Where a defendant is accused of a murder committed by stabbing, evidence is certainly relevant which shows, or tends to show, that at the time of the homicide he was in possession of a weapon or instrument capable of causing the fatal wound. There can be no doubt that evidence that the defendant had such a knife the day before the homicide would be relevant; and so proof to the same effect going further and further back in time would be equally relevant if its character was such as to warrant the inference of a continued possession. So, also, the possession of a knife of the requisite character immediately after the homicide would be admissible. If, for example, such a knife had been found by the fence beside which the defendant testified that he slept on the night of his flight, can there be any doubt that proof of that fact would be relevant? Following the course of his flight the discovery of a weapon resembling one that he was proved to have owned anywhere along his course, especially if found under circumstances indicating a desire to conceal it, would, I think, have a legitimate bearing as tending to establish the ability of the defendant to commit the crime charged. It was admitted that the defendant had been at Greenway, and as he was then about to go to his sister's, where his presence would certainly

become known, he would naturally desire to dispose of his knife, if he had one, inasmuch as its possession would be used as evidence against him. He, therefore, might have left his knife there, and if he was guilty would be almost sure to do so. In addition we have the fact that a knife is discovered at this place through the instrumentality of a friend who, according to his own statement, at once disposed of it in such a way as to render its recovery impossible. This knife is shown to correspond in pattern and character with that which several witnesses had actually seen in the hands of the defendant. In view of all these circumstances I am not prepared to say that any error was committed by the learned trial judge in receiving this evidence.

And neither was any error committed, in my opinion, in permitting the knife denominated Exhibit No. 3 to be used upon the trial as a model of the knife alleged to have been owned and possessed by the defendant. Its similarity to the original was vouched for by several witnesses, who swore that it was like the knife which they had seen in the hands of the defendant, and the witness who testified to the finding of the knife at Greenway declared that the knife which he found was similar to this exhibit. There can be no doubt that if a knife had been discovered upon the person of the defendant when he was arrested which was of a character capable of inflicting the fatal wound, that knife could properly have been introduced in evidence. In attempting to establish the defendant's possession of such a knife. the district attorney was not restricted to verbal descriptions by the various witnesses in a case where the construction of the instrument was somewhat exceptional, and a much more accurate idea of its true character could be conveyed to the jury by means of a model than by word of mouth. It is a common practice in the courts of this State and probably throughout the Union to furnish such assistance to jurors by the employment of

maps, diagrams, drawings and photographs as well as by models, the purpose being to enable the jury to use their eyes as well as their ears in order to gain an intelligent comprehension of the case. " Nothing short of an exact representation to the sight," said TENNEY, C. J., in *State v. Knight*, 43 Me. 132, " can give with certainty a perfectly correct idea to the mind." Of course in actual practice these accessories to the understanding must often be only approximations to the actualities; but it is enough to render a model receivable for purposes of illustration if it fairly represents the original object. This doctrine was applied by this court in the case of *Archer v. N. Y., N. H. & H. R. R. Co.,* 106 N. Y. 589, 603, where a photograph was held to be admissible as a fair representation of the locality of the accident upon the declaration of a witness to that effect, although the witness had not taken the photograph and knew nothing about the circumstances under which it was taken.

The next exceptions in the order of their importance which call for our consideration are those relating to the admissibility of the statement of the deceased immediately after he was wounded to the effect that Del Vermo had stabbed him, and his subsequent statements, which were received as dying declarations. The first statement does not appear to have been offered or received as a dying declaration at all, but was admitted rather as a part of the *res gestae* in the broadest sense of that term. I think that it must be deemed to have been properly received under the exception to the general rule excluding hearsay evidence, which is treated by Professor Wigmore under the convenient term of " spontaneous exclamations." (3 Wigmore on Evidence, § 745.) That exception may be stated as follows: Evidence is admissible of exclamatory statements declaratory of the circumstances of an injury when uttered by the injured person immediately after the injury; provided that such exclamations be spontaneously

expressive of the injured person's observation of the effects of a startling occurrence, and the utterance is made within such limit of time as presumably to preclude fabrication. It will be observed that this exception contemplates and permits proof of declarations by an injured person made *after* the event, so that it cannot fairly be said that the words spoken really constituted a part of the thing done. In some jurisdictions this has been regarded as a fatal objection to the reception of such evidence. (See *Parker v. State,* 136 Ind. 285; *State v. Estoup,* 39 La. Ann. 219; *State v. Hendricks,* 172 Mo. 654.) In most of the States, however, the doctrine is accepted. It was clearly sanctioned by this court by what was said in *Waldele v. N. Y. C. & H. R. R. C. Co.* (95 N. Y. 274, 279, 280) in approval of the decision of the Supreme Judicial Court of Massachusetts in *Commonwealth v. Hackett,* 2 Allen, 136. In this Massachusetts case, which was an indictment for murder, the evidence tended to show that the defendant suddenly approached the deceased, one Gillen, in the night time, stabbed him in the abdomen and ran away. When the blows were inflicted, Gillen cried out, "I am stabbed." A witness for the government testified that upon hearing this exclamation, and within twenty seconds after it was made he went to Gillen and heard Gillen say: "I'm stabbed—I'm gone—Dan Hackett has stabbed me." The admission of this testimony was sustained on the ground, as stated in the opinion of BIGELOW, C. J., that the remark of the deceased " was an exclamation or statement contemporaneous with the main transaction, forming a natural and material part of it and competent as being original evidence in the nature of *res gestae.* * * * They were uttered after the elapse of so brief an interval and in such connection with the principal transaction as to form a legitimate part of it and to receive credit and support as one of the circumstances which accompanied and illustrated the main fact which was the subject of

inquiry before the jury." Strictly speaking, the spontaneous declaration there under consideration did not really form part of the *res gestae* as being itself a verbal act contemporaneous with the principal occurrence, for the exclamation was uttered after the act of stabbing had been wholly completed and after the assailant had fled, although it is true that the time which had elapsed was very short. The decision, therefore, is clearly an authority for the admissibility of proof of such exclamations relative to an injury provided they are of the character and are made under the conditions which have already been stated, although they are subsequent in point of time to the infliction of the injury. If they are the impulsive or instinctive outcome of the act they need not be strictly contemporaneous in order to render them admissible.

Mr. Wigmore cites a large number of decisions in support of this doctrine which I will denominate for convenience the spontaneous exclamation exception to the hearsay rule. I will refer only to a few cases illustrative of the principle involved. In *State v. Morrison,* 64 Kansas, 669, the defendant, Jessie Morrison, was accused of having killed Mrs. Clara Wiley Castle by cutting her throat with a razor, being prompted to the crime by the recent marriage of the deceased to a man to whom the defendant was warmly attached. The defendant and the deceased were alone in her house at the time of the commission of the crime. Mrs. Castle was found lying on the floor bather in blood with her throat cut in such a manner that the windpipe had been severed and consequently she was speechless. The defendant was lying beside her. Her defense was that Mrs. Castle had been the assailant and that in resisting the attack the defendant had wrested the razor from Mrs. Castle's hand and inflicted the fatal wound in attempting to protect herself. Within five minutes after the two women were discovered the deceased motioned for pencil and paper and when they were handed to her wrote upon the

paper, " Jess Morrison killed me." Proof of this fact was held to have been properly received, the court saying that under the circumstances the interval of time which elapsed between the cut and the writing of the words was not an objection to the admission of the paper. " The declaration by Mrs. Castle," said JOHNSTON, J., " appears to have been voluntary and spontaneous and was so closely connected with it as to be really a part of the transaction and to exclude the idea of fabrication." In *Commonwealth v. Werntz*, 161 Pa. St. 591, the declarations of the deceased as to the identity of the person who stabbed him made shortly after he had been brought out of the shed in which the affray occurred and while his wound was being dressed in a barber shop across the street were pronounced " the most material evidence " in the case. The court said: " The interval of time from the stabbing and the distance of the barber shop from the shed, do not appear with exactness, nor are they material, for it is apparent that they were not great and that the continuity of the events was not broken. The declarations were made by the party best informed and most interested and were made at a time and place to a person and under circumstances which effectually exclude the presumption that they were the result of premeditation and design." In *Travelers' Insurance Co. v. Sheppard*, 85 Georgia, 751, 775, the court was called upon to consider the scope of a section of the Georgia Code, which provides as follows: " Declarations accompanying an act or so nearly connected therewith in time as to be free from all suspicion of device or afterthought are admissible in evidence as part of the *res gestae*." " What the law altogether distrusts," said Chief Justice BLECKLEY, " is not after-speech but after-thought. * * * The rule contemplates that all the *res gestae*, including declarations forming part thereof, must transpire within the present time of the transaction. But that time, while it cannot be less, may be more extended than the present of the principal fact, in some

instances a little, in others much, and in others very much more. Usually if they can all be ascertained, some of the *res gestae* will be found simultaneous with, and some anterior and some posterior to the principal fact. Thus, suppose an electric discharge during a summer shower to be the principal fact, the formation of the cloud, the falling of the rain, the thunder and its reverberation would all for some purposes be within the *res gestae* of the event though the principal fact was but a flash of lightning." As to the character of the declarations, he adds: "That they shall be or appear to be spontaneous is indispensable, and it is for this reason alone that they are required to be speedy. There must be no fair opportunity for the will of the speaker to mould or modify them. His will must have become and remain dormant so far as any deliberation in concocting matter for speech or for selecting words is concerned."

The distinction between spontaneous declarations and other declarations deemed part of the *res gestae* was clearly pointed out by the present chief judge of this court when he was a member of the Appellate Division in the Second Department in the case of *Patterson v. Hochster,* 38 App. Div. 398, where he said: "Declarations admitted as part of the *res gestae* may be divided into three classes: The *first* is where they constitute a part of the transaction itself which is sought to be proved; the *second* is where they tend to qualify, explain or characterize the acts which they accompany; the *third* is where the declarations are made at the time of the transaction, but relate solely to the acts and conduct of others. The text books and decided cases justify the admission of all these declarations on the same ground as being part of the *res gestae.* But it is apparent that, logically and on principle, the admission of declarations of the third class must stand on a different ground from that which supports the admission of the two other classes. If a man, being wounded, calls out, ' John has stabbed me,' the declaration in no way qualifies or explains the act of

the person who stabbed him.   In reality testimony to the declaration is pure hearsay, and is admissible in evidence only upon the great improbability that the spontaneous utterance of the instant should be false."

As to the statements of the deceased which were admitted, as dying declarations, I think that the preliminary proof was sufficient to justify their introduction as such.   Bochicecheo testified that when Tony Page got into his yard after being wounded, he exclaimed:   "Oh! my poor children!   I am going to die.   What are my children going to do after this?"   He then entered the house and was met by his wife to whom he said:   "Andrea Del Vermo stabbed me with a knife."   Mrs. Page began to weep and her husband, who had been placed in a chair, cried:   "My poor family!   I am going to die!   I am going to die!"   A neighbor named Mrs. Ross, who was sitting in a front room of her dwelling just across the street from where the Pages lived, heard Tony Page just after he reached home call for his children and say:   "My dear children, I am dead."   Another witness who visited the deceased after he had been taken to a hospital at a later hour asked him what was the matter.   Tony Page answered:   "We were walking on the street along and he pulled a knife and stabbed me with the knife."   The witness asked:   "Who was it?"   and the deceased answered:   "Andrea Del Vermo."   Finally there was the testimony of the sister of the deceased, who went to his house upon learning that he had been stabbed, to the effect that he told her that he was going to die and asked her to look after the children.   In response to a question from her as to how he got cut, he said:   "I got stabbed and Andrea Del Vermo stabbed me."   The picture presented by this proof is that of a man actually dying whose utterances were spoken under a sense of impending death and without hope of recovery.   This constituted a sufficient foundation, under all the authorities, for the admission of his declarations as to the

identity of his assailant. While it was incumbent upon the prosecution to show to the satisfaction of the judge that the person making the declaration was in actual danger of death and had given up all hope of recovery at the time when his declaration was made (Stephen's Digest, Law of Evidence, art. 26), that fact might be proved like any other fact in the case, and could be inferred from the existing and surrounding circumstances. (*People v. Simpson,* 48 Mich. 474.)

The only other assignment of error with regard to the admission of evidence which requires notice relates to the proof showing trouble at Daniel Page's saloon prior to the tragedy, not only between the defendant and the deceased, but between the defendant and third persons. The learned counsel for the appellant, although conceding that it was probably competent to prove the card playing at the saloon and what words, if any, passed between the deceased and the defendant, asserts that it was entirely improper for the district attorney to introduce evidence as to the trouble between the defendant and Bochicecheo. As to this point it may be observed, in the first place, that the incidents were so connected that it was difficult to present an account of one of them to the jury without disclosing something about the others. In the second place, it is impossible to perceive how the testimony to the effect that the defendant had been engaged in a dispute with Bochicecheo, giving rise to bad blood between them, could possibly have done him any injury on the trial. His contention was that the death of Tony Page was due to an accident growing out of an affray, in which Bochicecheo had endeavored to shoot him; and this story was very much more likely to be believed by the jury if they believed that the earlier occurrences of the evening had aroused a feeling of hostility toward the defendant on the part of Bochicecheo.

The only remaining point which requires specific consideration is the proposition that even if the homicide was committed by the defendant the evidence failed to establish any facts from

which either premeditation or deliberation could properly be inferred by the jury. The court was requested to charge that there was not sufficient evidence of deliberation and premeditation in the case to justify the jury in finding the defendant guilty of murder in the first degree. The learned trial judge refused to charge this request, but submitted the question to the jury, saying: " It is for you to determine from this evidence whether the defendant is guilty of murder in the first degree or not." There was no error in this ruling. While it is true that the evidence is meagre on the subject of motive we are compelled to recognize the fact that many terrible crimes are committed for which it is impossible to detect any adequate motive which can reasonably be regarded as sufficient to influence even a person of criminal instincts to their perpetration. Here, however, there was some evidence tending to show that ill-feeling had bee aroused between the defendant and the deceased at the time of the card playing several hours before the tragedy. According to Bochiccheo's testimony still later in the evening the defendant manifested a bloodthirsty disposition by threatening to assault him with a knife, and the statement of the same witness as to the defendant's boast of intimacy with Mrs. Page immediately prior to the stabbing strongly tended to show the existence of deliberate hostility on his part toward the husband just before the fatal blow was inflicted.

Our examination of the facts satisfies us that we ought not to interfere with the verdict in this case on account of any lack of cogency or sufficiency in the proof against the defendant, and as no error of law was committed upon the trial it becomes our duty to affirm the judgment.

GRAY, HAIGHT, WERNER, HISCOCK and CHASE, JJ., concur; CULLEN, Ch. J., concurs except as to the competency of the evidence as to the finding of the knife at Greenway station, which, however, he deems to have been in no way prejudicial to the defendant.

Judgment of conviction affirmed.