ANNA HANDEL, as Administratrix, etc., of JOHN J. HANDEL, Deceased, Appellant, *v.* NEW YORK RAPID TRANSIT CORPORATION, Respondent.

Second Department, July 8, 1937.

*William A. Blank* [*Bernard Meyerson* with him on the brief], for the appellant.

*Andrew F. Van Thun, Jr.* [*George D. Yeomans* with him on the brief], for the respondent.

TAYLOR, J. In an action to recover damages for the death of plaintiff-appellant's intestate alleged to have resulted from the negligence of the defendant-respondent, judgment dismissing the complaint, entered upon a nonsuit, affirmed, with costs. The plaintiff's proofs failed to establish, *prima facie*, a cause of action. The claimed declaration of the intestate after the happening of the accident, to wit, " Save me. Help me — why did that conductor close the door on me," was incompetent as evidence and properly excluded by the trial court. The declaration was not admissible as part of the *res gestæ*. (*Waldele* v. *N. Y. C. & H. R. R. R. Co.*, 95 N. Y. 274; *Martin* v. *N. Y., N. H. & H. R. R. Co.*, 103 id. 626;

*Greener* v. *General Electric Co.*, 209 id. 135; *Hill* v. *Erie Railroad Co.*, 221 App. Div. 518.) It was narrative of a past event and within the hearsay rule.

DAVIS, ADEL and TAYLOR, JJ., concur; CLOSE, J., with whom HAGARTY, J., concurs, dissents and votes for reversal of the judgment and for a new trial, with opinion.

CLOSE, J. (dissenting). In my opinion the evidence, offered in behalf of the plaintiff, of a statement made by the decedent after the accident was admissible as a part of the *res gestæ*, and the trial court erred in excluding it. A recital of the circumstances under which the statement was made will serve to define the point of law.

The decedent was a police officer attached to Precinct 60, located at West Eighth street, Brooklyn. At some time between three-forty and four o'clock in the morning of April 22, 1934, Timothy Downing, another policeman, saw him coming from a nearby lunch wagon. Handel was off duty, having finished at midnight, and was not due back at the station house until the following afternoon. After a brief conversation, the two policemen crossed the street to the West Eighth Street station of the defendant's elevated railroad, located almost opposite the precinct station house. Handel passed through the door, and Downing last saw him as he was going up the stairs toward the elevated platform, As Downing walked back across the street he heard the rumble of an approaching train. It was then about four o'clock.

Mrs. Ida Pfeifer lived on the top floor of an apartment house on West Third street, with her bedroom window directly facing the elevated structure. She slept with the window open. She testified that at about four o'clock in the morning she was awakened by the sound of someone screaming. Looking out the window, she saw a train come to a stop and something that looked like "a big bundle" fall from the side door of the last car down to Park place. The screaming continued. Mrs. Pfeifer put on a bathrobe and slippers, ran down three flights of stairs to the front entrance of her house, and proceeded from there to Park place, a distance of about seventy feet. There she found the body of Handel. He was moaning, and made a statement to the witness which was excluded from evidence on the defendant's objection. The record shows that the witness would have testified, if permitted, that Handel said, " Save me. Help me — why did that conductor close the door on me."

John Leyton also lived in the vicinity of West Third street and Park place. A little before four o'clock in the morning he had taken his dog out for a walk. When he returned it was " Pretty

near four o'clock." As he approached the house he heard the noise of an elevated train, and looking up he saw a train stop near West Third street. Leyton put the dog in the house and stepped out again. As he did so he heard someone moaning under the elevated structure. He estimated that it took him about half a minute to get to where Handel lay, and that about two and one-half minutes elapsed between the time when he heard the train and his arrival at the place where the deceased lay. Mrs. Pfeifer was already there. Leyton would also have testified to Handel's statement if permitted to do so. One of Handel's shoes was missing, and his pants were torn off from the hips down.

Officer Downing testified that he received word of the accident about three-quarters of an hour after he had left Handel at the station entrance. In company with a detective named Fitzsimmons, he went up to the station platform, walked to the end of the platform, and then proceeded along a " catwalk " beside the tracks. The " catwalk " ended about fifty feet from West Third street. The two men then walked on the ties between the rails to a point just over the curb of West Third street, about 1,000 feet distant from the station entrance. There they found a shoe, with the laces broken out of it, wedged between the rail and a wooden beam. The toe of the shoe pointed back toward West Eighth street.

Downing returned and examined the station platform. He found two dark marks running parallel with the edge of the platform for a distance of about 125 to 150 feet, increasing in width as they approached the end of the platform. The inference is that the marks were made by the rubber heels of Handel's shoes as he was dragged along by a moving train. Beyond the end of the platform no marks were visible.

When the decedent was examined by a doctor it was found that, in addition to numerous lacerations and contusions, he had suffered a concussion of the brain, a broken right hand, a fracture of the right femur, a broken pelvis, and a ruptured bladder. He was also in profound shock. Of course, this must have been his condition at the time when he made his statement to Mrs. Pfeifer and Leyton. Apparently, he died later in the day.

The foregoing is substantially all the evidence offered by the plaintiff. At the close of the plaintiff's case, the trial court dismissed the complaint. We are all agreed that the dismissal was proper if the declaration of the decedent was properly excluded; because without that declaration the record is wholly lacking in proof of negligence on the part of the defendant. From the drag marks on the platform, the broken shoe wedged between the rails,

and the fact that the deceased was seen to fall from the car door at just about the point where the shoe was found, it might reasonably be inferred that the deceased had, in some manner, been caught in the door at the station platform; that he had been dragged along with his body hanging outside the train as far as West Third street; that his foot had then become caught between the ties or the rails; and that his shoe had been torn off and his body jerked from the train at the same time. But the circumstances throw no light on how the deceased came to be trapped in the door, and the proof is therefore insufficient to warrant an inference of negligence.

However, the declaration of the deceased, if admissible, would constitute some evidence of negligence. In death cases, where there is no eye-witness to the occurrence, less proof is required than would otherwise be the case. (*Sackheim* v. *Pigueron*, 215 N. Y. 62; *Frate* v. *State of New York*, 245 App. Div. 442.) The question to be determined is whether this evidence was competent as a part of the *res gestæ*. The trial court concluded, on the authority of *Waldele* v. *N. Y. C. & H. R. R. R. Co.* (95 N. Y. 274) and *Hill* v. *Erie Railroad Co.* (221 App. Div. 518) that the evidence was not admissible under that exception to the hearsay rule. A majority of this court are of the same opinion. With that conclusion I disagree.

In *Waldele* v. *N. Y. C. & H. R. R. R. Co.* (*supra*) the deceased, a deaf mute, had been run down by a train and fatally injured. No one saw the accident. About thirty minutes later the injured man made a statement in sign language to his brother, who was also a deaf mute. At the trial the brother was permitted to quote this statement, as follows: " John said he got hit! John said there was a long train, that he stood waiting for it to go, and an engine followed and struck him." It was held that this statement was not admissible as a part of the *res gestæ*. The court quoted the following statement of the principle from *Lund* v. *Tyngsborough* (9 Cush. 36), and said it stated the rule correctly: " When the act of a party may be given in evidence, his declarations, made at the time, and calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction, and so as to derive credit from the act itself, are admissible in evidence. The credit which the act or fact gives to the accompanying declarations, as a part of the transaction, and the tendency of the contemporary declarations, as a part of the transaction, to explain the particular fact, distinguish this class of declarations from mere hearsay." The practical effect of that statement of the rule is to exclude all statements made after the principal event,

and if that is still the law the declaration made by the deceased in the present case was properly excluded by the trial court. Under very similar circumstances, the *Waldele* case was followed in *Martin* v. *N. Y., N. H. & H. R. R. Co.* (103 N. Y. 626).

But in *People* v. *Del Vermo* (192 N. Y. 470) the court seems to have introduced a broader rule. That was a homicide case in which the defendant was charged with the fatal stabbing of one Page. A witness was permitted to testify that he was walking along the street with the defendant and Page when suddenly the defendant started to run; that Page walked forward a few steps and fell to the sidewalk; that the witness asked him, " What is the matter?" and that Page answered, " Del Vermo stabbed me with a knife." It was held that this evidence had been properly received as a part of the *res gestæ*. The court stated the following rule (p. 483): " Evidence is admissible of exclamatory statements declaratory of the circumstances of an injury when uttered by the injured person immediately after the injury; provided that such exclamations be spontaneously expressive of the injured person's observation of the effects of a startling occurrence, and the utterance is made within such limit of time as presumably to preclude fabrication. It will be observed that this exception contemplates and permits proof of declarations by an injured person made *after* the event, so that it cannot fairly be said that the words spoken really constituted a part of the thing done." Certainly this seems to be a departure from the rule laid down in the *Waldele* case, where it was said that the declaration and the event must be parts of the same transaction. Whether or not the two cases are harmonious in principle, it is quite certain that in the *Del Vermo* case it was held that statements made after the event are admissible, provided (1) they are spontaneous in character and (2) they follow so closely on the event as presumably to preclude fabrication. The court called this " the spontaneous exclamation exception to the hearsay rule."

In *Greener* v. *General Electric Co.* (209 N. Y. 135) the deceased fell from a ladder and was fatally injured. A fellow-workman, who had been standing a few feet away from where the deceased fell, was permitted to testify that he went over to the deceased and asked him what had happened; and that the deceased said, " My feet is broke; the ladder bent over." It was held that this evidence had been improperly admitted. The court commented on the *Del Vermo* case, and drew the following distinction: " The distinction to be made is in the character of the declaration; whether it be so spontaneous, or natural, an utterance as to exclude the idea of fabrication; or whether it be in the nature of a narrative of what had occurred. In the present case, the declaration of the

deceased was not spontaneous; it was called forth by the inquiry as to ' what had happened ' and was, distinctly, narrative."

It is rather difficult to see why the statement, " Del Vermo stabbed me," is a spontaneous exclamation, rather than a narrative of a past event, while " the ladder bent over " is just the reverse; both statements having been made immediately after the happening of the event and in response to an inquiry from a companion.

The Appellate Division, Fourth Department, observed in *Hill* v. *Erie Railroad Co.* (221 App. Div. 518) that " it seems impossible to distinguish the facts " of *People* v. *Del Vermo* and *Greener* v. *General Electric Co.* In any event the *Greener* case did not change the principle of *People* v. *Del Vermo*, and it must still be the rule that a statement made after the occurrence is admissible, provided the statement is spontaneous and the interval sufficiently brief.

These elements were again stressed in *People* v. *Sprague* (217 N. Y. 373). The defendant was charged with shooting a man named Martin. There was evidence that Martin had been shot while standing in a potato patch; that he had walked to his home, and that on reaching the doorway a witness had asked him, " What is the matter?" and that he had answered, " Charley Sprague has shot me." It was held that this evidence was inadmissible, because it was neither spontaneous in character nor made within a sufficiently brief period after the shooting. On the other hand, in *People* v. *Curtis* (225 N. Y. 519) a declaration was held to have been properly received where the statement was natural and spontaneous and was made very shortly after the event. The defendant was charged with having run down one Cole with his automobile and with having left the scene of the accident with knowledge that Cole had been injured. There was testimony that, as the defendant drove away, Cole had said, " Oh my God, get me help; get me a doctor." The court pointed out the spontaneous character of the exclamation, and the fact that it had been made within a few seconds after the defendant had left the scene; and concluded that all the circumstances excluded the idea of fabrication.

The second of the two cases relied on by the trial court was *Hill* v. *Erie Railroad Co.* (221 App. Div. 518). There it was claimed that the deceased, a boy named O'Donnell, had been shot by one of the defendant's agents. After the lapse of an undetermined period, a clergyman was brought to where the boy lay in a freight yard, and in his presence the boy said to the defendant's agent, " What did you shoot me for: I didn't do nothing." The clergyman was permitted to testify to the statement. On appeal this was held to be error. The court pointed out that the length of time which had elapsed between the shooting and the declaration was not known, but that it must have been substantial; that during

a very considerable interval the boy had both the ability and the opportunity to plan, coupled with a distinct grievance which presented an inducement to speak falsely.

Coming now to the facts of this case, it is quite clear that the rule which we have to apply is the one stated in *People* v. *Del Vermo*. None of the latter cases attempt to vary the principle, although in applying it to particular facts the conclusions reached may at times appear confusing. We must answer two questions: (1) Was the declaration "spontaneously expressive of the injured person's observation" of the occurrence? (2) Was the utterance made "within such limit of time as presumably to preclude fabrication?"

Handel's statement was of a spontaneous character. It was not made in response to any question — a circumstance which was emphasized in *Greener* v. *General Electric Co.* (*supra*) and *People* v. *Sprague* (*supra*). The spontaneous nature of the utterance is shown by the words "Save me. Help me," which preceded the reference to the action of the conductor. In this respect it resembled the words used in *People* v. *Curtis* (*supra*). The statement about the conductor took the form of a question, "why did that conductor close the door on me," which in itself is an indication of spontaneity. A construction which holds this declaration merely a narrative of a past event ignores the language used and its plain implications.

The other element is that of time. We are asked to consider the fact that the deceased had traveled from West Eighth street to West Third street before he fell. I would disregard that entirely. On a journey so perilous, one has little leisure for plotting fiction. The only material period of time is that which elapsed after the deceased fell to the street. The best estimate of the interval is that given by the witness Leyton, who said that about two and one-half minutes elapsed between the time when he heard the train and his arrival at the place where Handel was found. This would be considerably shorter than the elapsed time in *Waldele* v. *N. Y. C. & H. R. R. R. Co.* (*supra*), and *Hill* v. *Erie Railroad Co.* (*supra*); but longer than the interval in *People* v. *Del Vermo* and *People* v. *Curtis*. But it is not a question of precisely how many seconds or minutes elapsed. The question is whether "the utterance is made within such limit of time as presumably to preclude fabrication."

My conclusion is that Handel's utterance came within the confines of the rule. It seems to me incredible that a man so broken in body and so profoundly shocked in mind could have spent the slight interval before aid arrived in manufacturing a false explanation of the extremity in which he was found.

If there is a " spontaneous exclamation exception to the hearsay rule," here is a case for its application. In my opinion the evidence was wrongly excluded, and the error requires a reversal of the judgment and a new trial.

HAGARTY, J., concurs.

Judgment dismissing the complaint, entered upon a nonsuit, affirmed, with costs.