*515 OPINION OF THE COURT
Hancock, Jr., J.
 In his appeal from a conviction for second degree murder, defendant’s chief contention is that the trial court committed reversible error in admitting testimony of several incriminating statements of the victim as excited utterances. Errol O’Neil was shot at approximately 2:00 p.m. on October 2, 1981 following an argument in the basement apartment of a two-family dwelling in Brooklyn where he resided with various relatives including his mother, Joyce Scott, and an uncle, Robert Hinds. We readily agree with the courts below that it was proper to admit the testimony of Scott and Hinds concerning statements made to them by O’Neil immediately after the shooting as he emerged from the apartment and during the automobile trip to the hospital. The principal question pertains to the testimony of Police Officer Turnbull about statements O’Neil made in response to the officer’s questions in the emergency room approximately 30 minutes after the shooting. For reasons which follow, we conclude that these statements were also properly admitted as excited utterances. Because we find no merit in defendant’s further contention that the proof of guilt was legally insufficient, there should be an affirmance.
I
In a pretrial hearing to determine the admissibility of the statements made by O’Neil, Scott testified that she heard "like a shuffling” in the basement and a door flying open, and then the sound of three shots. When she heard an exclamation from her son she "start[ed] screaming” and ran out of the house. She saw one Trevor Campbell, "another guy by the *516 name of Killer [Michael Remaken]”, and defendant running away. Immediately thereafter, she saw her son coming from the basement, holding his stomach with both hands. She asked, "Errol, what happened?”. He replied, "They shot me, Ma.”
Scott rushed into the house, called the emergency number 911, and returned to her son who "was sitting on the steps, you know, at the door” and was "in pain — a lot of pain”. By then, her brother-in-law, Hinds, had arrived. Together they helped O’Neil into an automobile and headed to the nearby Baptist Medical Center. En route, according to Scott, her son was "in a lot of pain”. He said, "Ma, I’m getting weak” and started hiccupping. She noticed that his eyes were "turning over in his head”. Hinds, she said, was driving "real fast” at her insistence "because I see [my son] was dying.” During the drive to the hospital Hinds asked O’Neil, "Who shot you, Errol?”. "Carlton did”, he replied.[1]
Officer Turnbull testified that at about 2:30 in the afternoon he and a police sergeant arrived at the hospital emergency room in response to the reported shooting. He was advised by the physician in charge that "O’Neil was in critical condition”. O’Neil, Turnbull said, was "laying on a gurney in the emergency room” and there "was an I.V. running into his arm”. Before talking with O’Neil, Turnbull "advised him that he was in critical condition and that there was a possibility that he might die”. In reply to Turnbull’s inquiry whether O’Neil would "tell [him] who committed the crime”, O’Neil answered "yes”. He then said that "Carlton Brown, Killer, a Jamaican, and Trevor Campbell shot me”. Answering further inquiries O’Neil said, according to Turnbull’s testimony, that "all three had guns”, that "they shot at [me] four times” and that the three "were probably at 568 Pine Street, on the second floor.” The questioning was terminated when the physician advised Turnbull that O’Neil was being taken into surgery. O’Neil died several hours later from three gunshot wounds, two of which were to the abdomen and had penetrated various vital organs.
In holding that the statements to Officer Turnbull were *517 admissible, the trial court found that "the totality of the circumstances indicate that Errol O’Neil was critically wounded by three gunshots, was in hemorrhagic shock, second degree, severe pain, and nearly died enroute to the hospital. He was told he may not make it and indeed died several hours later. There was no time for reflection, nor was he in any condition to reflect.” Relying on the criteria set forth in People v Edwards (47 NY2d 493), the court held that neither the lapse of time between the shooting and the emergency room statements nor the fact that the statements were in response to Turnbull’s questions precluded the ultimate finding that O’Neil’s statements were "not made under the impetus of studied reflection” (id., at 497).
Because of its ruling that the emergency room statements were admissible as excited utterances, the court did not reach the People’s alternative argument that the statements were admissible under a separate and different theory, i.e., as dying declarations (see generally, People v Nieves, 67 NY2d 125, 132-133). The Appellate Division unanimously affirmed in a memorandum, finding that the record supports the conclusion that the statements were made while O’Neil remained under the stress and excitement from the shooting. The appeal is before us by leave of a Judge of this court.
II
The present rule permitting the admission of excited utterances as an exception to the hearsay rule has evolved from earlier cases in which, following English precedents, we allowed proof of so-called "spontaneous declarations” only if they could be shown to have been part of the res gestae, i.e., "made at the same time, or so nearly contemporaneous [with the transaction] as to characterize it, or throw [some] light upon it” (Waldele v New York Cent. & Hudson Riv. R. R. Co., 95 NY 274, 278; Richardson, Evidence § 281 [Prince 10th ed]; see also, Whitaker v Eighth Ave. R. R. Co., 51 NY 295; Insurance Co. v Mosley, 8 Wall [75 US] 397). In Waldele, for example, sign language communications by a deaf mute made 30 minutes after being struck and fatally injured by a railroad train were excluded because "declarations made after the accident had happened, after the train had passed from sight, and the whole transaction had terminated were no part of that res gestae, had no connection with it, and were purely narrative” (95 NY, at 286, supra).
*518 In later cases, our court, adopting the approach urged by Wigmore and other commentators, began to abandon its earlier strict res gestae analysis and the attendant requirement that the declaration be a verbal act forming part of the transaction itself (see, People v Del Vermo, 192 NY 470, 483; see, e.g., People v Marks, 6 NY2d 67, 71).[2] In People v Marks (supra) we left no doubt that an excited utterance or spontaneous declaration, although a narrative of a past transaction and not a part of the res gestae, could nevertheless be admitted as an exception to the hearsay rule under certain circumstances. The rationale for the exception, we noted, was not res gestae but, as explained by Dean Wigmore in his treatise, that " 'under certain circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control * * *. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker’s belief as to the facts just observed by him; and may therefore be received as testimony to those facts’ ” (6 NY2d, at 71-72, supra, quoting 6 Wigmore, Evidence § 1747 [I] [3d ed]).
Moreover, we emphasized in People v Marks (supra), again citing Wigmore, that "there can be no definite or fixed limit of time within which the declaration [must] have been made [and] each case must depend upon its own circumstances” (id., at 72; see also, 6 Wigmore, Evidence § 1750 [Chadbourn rev 1976]). The test is whether the utterance was made "before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance” (id., at 72).
In our most recent discussions of the admissibility of excited utterances, we have adhered to the course set in People v Marks (supra) and avoided the strict res gestae analysis in favor of admitting such declarations because "as * * * impul *519 sive and unreflecting responses * * * to the injury or other startling event, they possess a high degree of trustworthiness” (People v Caviness, 38 NY2d 227, 231 [emphasis added]). Thus, in People v Caviness (supra) we abandoned as an "unjustifiable evidentiary stance” (id., at 231) the rule that an excited utterance of a nonparticipant in the event had to be excluded because it was not a part of the event itself — i.e., the res gestae. And finally, in People v Edwards (supra), we dispelled any remaining doubt that in New York statements made in response to questioning could, nevertheless, be admitted as excited utterances. We noted our approval of the view, implicit in our decision in People v Del Vermo (supra) and adopted since then by most courts which have addressed the issue, that the fact that an utterance is in response to an inquiry is "merely one factor bearing on spontaneity” within the meaning of the excited utterance rule (People v Edwards, supra, 47 NY2d, at 498, n 2; see, cases cited n 2, id.). In an opinion per Chief Judge Cooke, we summarized the present rule as follows: "The admissibility of an excited utterance is entrusted in the first instance to the trial court. In making that determination, the court must ascertain whether, at the time the utterance was made, the declarant was under the stress of excitement caused by an external event sufficient to still his reflective faculties, thereby preventing opportunity for deliberation which might lead the declarant to be untruthful. The court must assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim to ascertain if there was significant opportunity to deviate from the truth. Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection” (47 NY2d, at 497, supra [emphasis added]).[3]
Ill
Whether O’Neil’s statements were, although descriptive of a past occurrence, nevertheless, admissible as utterances made "under the stress of excitement caused by an external *520 event” and not "under the impetus of studied reflection” (People v Edwards, supra, at 497) was, of course, a determination to be made, in the first instance, by the trial court after consideration of all the circumstances (see, id., at 497; People v Caviness, supra, at 231; People v Marks, supra, at 74-76; 6 Wigmore, Evidence § 1750 [b] [Chadbourn rev 1976]; Richardson, Evidence § 281 [Prince 10th ed]; McCormick, Evidence § 297, at 857 [3d ed]; cf., United States v Iron Shell, 633 F2d 77, 86, cert denied 450 US 1001). Given the sudden and violent nature of the event, the mortal wounds inflicted, the extreme pain and the unrelenting physical and emotional trauma caused thereby, and given, additionally, the brief time between the shooting and the statements, there can be no question that O’Neil’s initial responses to his mother and his uncle made at the scene and on the way to the hospital were made while he was still under the influence "of the excitement precipitated by an external startling event” (People v Edwards, supra, at 497). The question is whether, as defendant contends, the lapse of more time between the event and the emergency room statements — approximately 30 minutes— and the fact that they were made in reply to a more formalized questioning by Officer Turnbull take the statements outside the excited utterance exception to the rule against hearsay, as a matter of law.
There is nothing in the record suggesting that O’Neil, 30 minutes after the event, was any the less under the influence of the stress and excitement of being shot three times and fatally wounded than he was immediately after the shooting. The pain was unabating and his condition steadily deteriorating. He was, according to his mother, "moaning” and speaking in a very low voice while en route to the hospital. He said to his mother, "Ma, I’m getting weak”, and he appeared to her— correctly as it turned out — to be dying. Upon his arrival at the hospital, O’Neil was comatose and determined to be suffering from hemorrhagic shock. He was resuscitated immediately prior to the brief period of questioning, which itself was interrupted by the physician to rush O’Neil into surgery. Under these circumstances, there is no basis for disturbing the trial court’s conclusion, that "the remarks were not made under the impetus of studied reflection”, other than some arbitrary limitation on the permissible period between the event and the excited utterance. We decline to adopt such a rule.
The imposition of an arbitrary time limit would run counter *521 to the assumptions underlying the admissibility of excited utterances and would contravene our recent decisions which have departed from the rigid res gestae analysis, with its requirement of contemporaneity, in favor of admitting excited utterances, as exceptions to the hearsay rule, on the basis of their inherent trustworthiness. Moreover, in recognizing that excited utterances made after the event may be admitted if "not made under the impetus of studied reflection” (People v Edwards, supra, at 497), we have necessarily acknowledged that the psychological and emotional effect of the sudden event may persist and continue to operate with undiminished force for a period of time thereafter. How long such effect may persist depends on many factors, including the nature of the initial trauma or shock and the subsequent activities of the declarant (see, id., at 497).
This is not to say, of course, that the length of the interval is not a significant factor in determining whether the effect of the event has continued or dissipated, for it surely is. We hold only that, under the circumstances here, the lapse of 30 minutes, is not, as a matter of law, too long. This holding, we note, is consistent with decisions in the majority of jurisdictions which have considered admissibility of statements in similar contexts, as well as with the virtually unanimous opinion voiced in the authoritative texts. (See, e.g., Haggins v Warden, 715 F2d 1050, 1058 [6th Cir] [declarant "still suffering” and "in critical condition” one and one-half hours later]; People v Washington, 71 Cal 2d 1170, 1176, 459 P2d 259, 263 [Traynor, Ch. J.] [declarant suffering critical brain damage and having difficulty breathing still "under the stress of excitement” 45 to 65 minutes later]; State v Stafford, 237 Iowa 780, 23 NW2d 832 [declarant disoriented for 14 hours after severe battering]; Commonwealth v Cheeks, 423 Pa 67, 70, 223 A2d 291, 293 [declarant crying and incontinent from the "overpowering emotional and shocking experience” of being stabbed almost an hour earlier]; see also, 6 Wigmore, Evidence § 1750 [b] [Chadbourn rev 1976] ["depends entirely on the circumstances of each case”]; 4 Weinstein & Berger, Weinstein’s Evidence [f 803 [2] (01), at 803-92 ["factors such as shock, unconsciousness or pain, may prolong the period”]; McCormick, Evidence § 297, at 856 [3d ed] ["that the declarant still appeared 'nervous’ or 'distraught’ and [under] continuing emotional upset will often suffice”]; Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale LJ 229 ["res gestae * * * this troublesome expression (em *522 ployed) to avoid the toilsome exertion of exact analysis and precise thinking.”].)
Nor does the fact that O’Neil’s emergency room statements were given in reply to the deliberate questions of a police officer necessarily preclude their admission as excited utterances. As with the lapse of time between the shooting and the statements — the nature, extent and purpose of the questions and the identity, position and manner of the questioner are but additional factors to be considered in determining whether the statements were made under the continuing influence of the stress and excitement generated by the initial event. (People v Edwards, supra, at 498-499; People v Marks, supra, at 73-77; see also, State v Berry, 241 Iowa 211, 40 NW2d 480 [murder observer’s answer to interrogation]; People v Damen, 28 111 2d 464, 193 NE2d 25 [rape victim’s responses to police officer]; Commonwealth v Von Smith, 303 Pa Super 534, 450 A2d 55 [robbery victim’s recollections in response to police questioning]; United States v Iron Shell, 633 F2d 77 [8th Cir], supra [sexual assault victim’s statements upon police interview]; Haggins v Warden, 715 F2d 1050 [6th Cir], supra [child rape victim’s answers to police sergeant]; see generally, McCormick, Evidence § 297, at 857 [3d ed]; Annotation, 80 ALR3d 369, 372.) The focus of the inquiry remains the same: the physical, psychological, and emotional condition of the declarant and whether it can be reasonably concluded "that the remarks were not made under the impetus of studied reflection” (People v Edwards, supra, at 497). Unless the questioning causes some interruption of or moderation in declarant’s continued stress and excitement from the shocking event, it does not, standing alone — any more than do other specific circumstances — defeat the admissibility of the responses as excited utterances.
In the present case, there was no showing that the emergency room questioning by Officer Turnbull in any way affected O’Neil’s condition or his continued state of stress and excitement from the shooting. Under these facts, we cannot say that the trial court erred in admitting the hospital statements as excited utterances.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Bellacosa concur.
Order affirmed.

. The record indicates that Hinds had asked the same question and received the same answer earlier, when O’Neil was still sitting on the house steps. The parties do not, however, distinguish that question and answer from the ones en route to the hospital and, in any event, the same analysis would apply. (See, infra.)

. In People v Del Vermo (192 NY 470, 483), in holding admissible statements of the deceased victim of a stabbing made after the event, we stated: "[i]t will be observed that this exception contemplates and permits proof of declarations by an injured person made after the event, so that it cannot fairly be said that the words spoken really constituted a part of the thing done” (emphasis in original).

. This court also noted in People v Edwards (47 NY2d 493, 496, n 1) that the term "excited utterance” was more accurately descriptive of the exception to the hearsay rule at issue and, accordingly, we adopted that nomenclature in our opinion.