OPINION OF THE COURT
William T. Martin, J.
The defendant, Morris Brown, is accused by indictment, of murder in the second degree (Penal Law § 125.25 [1]), a class A-I felony, manslaughter in the first degree (Penal Law § 125.20), a class B felony, and criminal possession of a weapon in the second degree (Penal Law § 265.03), a class C felony.
FINDINGS OF FACT
During the trial of this case and after the court had given opening remarks to the jury, the prosecutor brought to the court’s attention the following information:
According to the prosecution, about a week ago, it was *327 discovered for the first time that a potential witness had earlier made an elongated statement attributable to the deceased, who made that statement at the time he was being killed, as well as a statement made by the defendant which was overheard by that witness. That statement by the deceased was not in response to any questions asked of him, but it accompanied his being shot allegedly by the defendant, Morris Brown, and by a coperpetrator, whose identity and whereabouts are unknown.
Apparently, as the deceased was being killed, that witness watched the alleged murder unbeknownst to either the defendant or the coperpetrator. The witness, Mr. Guillermo Ayala, testified at the instant trial and revealed that he had given that statement about a year or two ago to the original Assistant District Attorney (hereinafter ADA) Bruce Birns, had testified in the Grand Jury, and had later spoken to the ultimate prosecutrix trying the case. In essence, the substance of the two statements allegedly declared by the deceased, as relayed by Mr. Ayala to ADA Birns, reveal that originally the deceased, while in a hallway with the coperpetrator, pleaded for his life and said, "Please don’t kill me, please don’t kill me”. Apparently, the coperpetrator fired the first shot. After the shot was fired, the coperpetrator then commanded the victim to get up, and the victim said to the coperpetrator, "I can’t get up because you just blew my leg off”. Next the defendant, Morris Brown, allegedly came up to the deceased and shot him point blank four to five times and then said, "is the super home?” However, the ultimate prosecutrix, ADA Walsh, after learning of the larger part of that witness’ statement, again about a week ago, failed to give the defense notice of it.
The following is a summary of the prosecutorial investigation of the matter as revealed at both a bifurcated hearing and during the trial of this matter:
On November 24, 1984, the decedent, David Anthony Holder, was shot and killed at 152 East 171st Street, apartment N, Bronx County. The defendant, Morris Brown, was a suspect to this homicide on the date of the homicide.
On or about March 1988, when the defendant was arrested in Jamaica, West Indies, statements were made by him to an officer in Jamaica. A written motion was submitted by the defense for copies of those statements. It was never answered by the People. Prior to that, evidence had been destroyed *328 which earlier had been recovered at an apartment that the defendant had access to and later vouchered at the Bronx property clerk’s office. Subsequent to that, an interview was had, by the original prosecutor, with Mr. Ayala, and statements were given to the prosecutor’s office. Those statements were not recorded. The defense received notice of only a part of that witness’ statement from a police report. The defense later received notice of one of the remaining statements, during this trial, after the jury was selected but prior to the jury being sworn. The defense received notice of another statement during the opening statement of the prosecutrix.
Specifically, the Bronx the District Attorney’s Office commenced an investigation of the homicide conducted by ADA Birns. At some point in time (date unknown but referenced to on or about August 1987 when the Bronx County District Attorney’s Office attempted to extradite the defendant, Morris Brown, from Jamaica, West Indies), ADA Birns received a statement from Mr. Guillermo Ayala. Mr. Ayala revealed that he was a witness to the killing of the deceased in which the defendant, Morris Brown, allegedly contributed. ADA Birns spoke to Mr. Ayala on several different dates. Apparently, according to testimony elicited from ADA Birns at a hearing on the admissibility of these statements, on one occasion Mr. Ayala was "very detailed about what he had seen and what he had overheard”. However, ADA Birns testified that he did not record the complete statement of Mr. Ayala, particularly those statements pertaining to the deceased exclaiming to his assailant that since "he had just shot him he [the victim], therefore, could not get up” or words to that effect, at all, other than possibly in the Grand Jury minutes. At the hearing ADA Birns made no reference to statement of the witness that he had overheard the defendant say, after the shooting, "is the super home?” Again, that particular statement surfaced for the first time when the ultimate prosecutrix made her opening statement. According to ADA Birns, it has been his prosecutorial practice for the past 10 years, based upon his knowledge of the notice provisions of CPL 710.30, not to give the defense notice of a statement of a deceased who was dying, which statement was overheard by a witness. More specifically, ADA Birns testified that he did not verbally give the defense notice of the complete witness statement by Mr. Ayala because the substance of that statement was contained in police reports which reports were turned over to the defense by the prosecutor.
*329 However, ADA Birns admitted, that although the police report memorialized a five-to-six-word statement, that the witness later had actually made a "very detailed statement” to him.
ANALYSIS
The position of the defense is that the prosecutor withheld notice of a statement as provided for under CPL 710.30 (1) (a) and that the People were obligated to give him the complete statement. Therefore, according to the defense, the sanction against them should be for the court to preclude any testimony about the entire statement of the witness.
The position of the prosecutor is that the testimony of Mr. Ayala should not be precluded based upon a twofold approach to its admissibility. First, the prosecution contends that under CPL 710.30 Mr. Ayala is a private citizen and not a defendant. According to the prosecution, CPL 710.30 (1) (a) applies only where a statement is made by a defendant to a police officer.
The prosecutor relies on People v Rodriguez (114 AD2d 525) and People v Hall (133 AD2d 845) and contend that the duty of the prosecution to turn over discovery is only with regard to statements made to police.
In Rodriguez (supra), the court held that the defendant’s claim that a notice pursuant to CPL 710.30 was required with respect to telephone statements allegedly made by him to the chief prosecution witness is without merit, since the witness was a civilian and was neither a public servant nor acting as an agent of law enforcement authorities. (People v Rodriguez, supra, at 526.)
In Hall (supra), the defense maintained that the trial court erred in permitting the complainant to testify about statements made by the defendant to the complainant’s husband about two or three weeks after the crime. The defense set forth that, since the prosecutor had withheld notice of statements, the defendant was denied the right to a fair trial. The court held that because the prosecutor had served a bill of particulars and a voluntary disclosure form in which it stated that the People did not intend to offer any statements of the defendant made to individuals who were not law enforcement personnel and later presented the complaining witness at trial, fair play required prompt disclosure to the defendant. (People v Hall, supra, at 846.) If the court, here, were to follow the reasoning of the Hall court, it would seem that fair play *330 in this case would dictate that the People be precluded from admitting testimony about statements made by the witness.
However, the court finds that under CPL 710.30 (1) (a) the prosecution is only required to give the defense notice of evidence of a statement by a defendant (and not a witness) to a public servant.
CPL 710.30 (1) provides, in relevant part, that "[w]henever the People intend to offer at trial (a) evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible upon motion pursuant to subdivision three of section 710.20 * * * they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.”
A public servant is defined as "(a) any public officer or employee of the state or of any political subdivision thereof or of any governmental instrumentality within the state, or (b) any person exercising the functions of any such public officer or employee. The term public servant includes a person who has been elected or designated to become a public servant.” (Penal Law § 10.00 [15].) This court takes exception to the contention of the People that CPL 710.30 (1) (a) applies only to police officers, and rules that that section extends to statements made by defendants to prosecutors.[1]
More importantly, this court finds, after reviewing the statements of members of the District Attorney’s Office with respect to their practice not to memorialize, in writing, their interview of a potential witness at trial, that it is necessary to examine the standards purportedly used by that office to determine whether a statement by a witness should be recorded.
*331 The Rosario rule requires, in substance, that the prosecution provide the defense with all pretrial statements of prosecution witnesses. (People v Rosario, 9 NY2d 286; see, People v Consolazio, 40 NY2d 446.)
In this trial, the prosecution contends that the larger statement is (1) the defendant said "is the super home?” and (2) the deceased said "I can’t get up because you just blew my leg off”. The prosecution argues that the second part of the witness statement is exculpatory as to the defendant (because it lays blame on the coperpetrator and not all of the blame initially on the defendant), but inculpatory as to the person he is charged with acting in concert with. However, this court determines that, under the theory of "Acting in Concert”, the criminal acts of one defendant are attributable to the other defendant. (Penal Law § 20.00.) Therefore, if as the prosecution stated, the statement is inculpatory as to the person who is not on trial, who this defendant allegedly acted in concert with, then it is also inculpatory as to this defendant under the theory of "Acting in Concert” and accessorial liability. The defendant was indicted on August 10, 1987. Since that time, up until a week before trial, the defense in this case was never aware of the entire statement. However, this statement was in the possession of ADA Birns between August 1987 and a week before the trial. The record reflects that both AD As Birns and Walsh did not prepare a written memorandum or notes pertaining to their interview of Mr. Ayala, a potential prosecution witness. In fact, both AD As Birns and Walsh set forth that it is their practice not to record the statements of witnesses because under CPL 710.30 there is no law that requires them to record statements which would require prior notice to the defense. Clearly, as this court has earlier set forth, the prosecution is only required to give the defense notice of a statement by a defendant to a public servant.
However, under Rosario (supra), the responsibility of the prosecution to provide the defense with all pretrial statements of prosecution witnesses is premised upon the assumption that a statement has been recorded as relayed by a witness for the prosecution. From this, the Rosario court explained that "a right sense of justice entitles the defense to examine a witness’ prior statement [to establish] * * * whether or not it varies from his testimony on the stand” and that the " 'State [should have] no interest in interposing any obstacle to the disclosure of facts.’ ” (People v Rosario, supra, at 289, 290.)
*332 While we recognize that the duty of the People to disclose pretrial statements of witnesses to the defense has been established, the practice of the People not to record statements of witnesses gives the prosecution the unilateral power to circumvent their duty to disclose, under Rosario (supra), by simply not preparing witness statements. This is patently unfair.
Second, turning to the other contention of the prosecution that the statement of the deceased "I can’t get up because you just blew my leg off’ or words to that effect said while he was being killed and overheard by an eyewitness is admissible, the prosecution cites the following cases: People v Edwards (47 NY2d 493), People v Caviness (38 NY2d 227), People v Del Vermo (192 NY 470), People v McCullough (73 AD2d 310), People v Wortherly (68 AD2d 158), and People v Nieves (referenced by this court to) (67 NY2d 125).
Hearsay is a statement made by someone, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. (See, Fed Rules Evid, rule 801 [c].) Accordingly, the statements by the deceased as offered by Mr. Ayala at trial may be inadmissible, if offered to prove the truth of the matter asserted therein, unless they fall within an exception to the hearsay rule. (See, Fed Rules Evid, rule 803 [1], [2] [excited utterance hearsay exception].)
" 'The admissibility of an excited utterance is entrusted in the first instance to the trial court. In making that determination, the court must ascertain whether, at the time the utterance was made, the declarant was under the stress of excitement caused by an external event sufficient to still his reflective faculties, thereby preventing opportunity for deliberation which might lead the declarant to be untruthful. The court must assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim to ascertain if there was significant opportunity to deviate from the truth. Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection’ ”. (People v Brown, 70 NY2d 513, 519, quoting People v Edwards, 47 NY2d 493, 497, supra.)
In Brown (supra), the court reasoned that under old case law, courts used a strict res gestae approach, i.ei, allowing *333 proof of spontaneous declarations, if made at the same time or so nearly contemporaneous with the transaction, in determining whether statements could be admitted as excited utterances. (See, People v Brown, supra, at 517.) From this, according to Brown, courts began to abandon that strict res gestae analysis and to require that the verbal act form part of the transaction itself. (People v Brown, supra, at 518, analyzing People v Del Vermo, supra, at 483.) The Brown court then formulated that recently excited utterances have been admitted if they " 'possess a high degree of trustworthiness’ ” since those statements are " 'impulsive and unreflecting responses * * * to the injury or * * * startling event’ ”. (People v Brown, supra, at 518-519, interpreting People v Caviness, supra, at 231.)
The Brown court then analyzed that the most recent application of the rule permitting the admission of excited utterances as an exception to the hearsay rule reveals that even statements made in response to questioning can be admitted as excited utterances. (People v Brown, supra, at 519, citing People v Edwards, 47 NY2d 493, supra.)
In the instant factual situation, Mr. Ayala testified that on November 25, 1984, the date of the homicide, after a conversation with his wife, he looked through the peephole of his apartment entrance door and observed the decedent on the floor apparently pleading with his attacker. According to Mr. Ayala, the decedent said, "I can’t get up because you blew may leg off”. Next, Mr. Ayala said that, after "a little while longer”, he observed another man, purportedly the defendant, Morris Brown, approach the deceased and shoot him four times and then state "is the super home?” or words to that effect.[2] It is evident that when the deceased stated (prior to his death and after he had been shot in the foot) "I can’t get up because you blew my leg off”, he was under the extremis of that wound when responding to his attacker. There is no doubt that the surrounding events here justify the conclusion that those words were not uttered under the stimulus of studied reflection. Under these facts, this court, therefore, rules that the statement is admissible as an excited utterance. *334 Accordingly, this court will not decide on the merits whether that statement is also admissible as a dying declaration.
FINDINGS OF FACT
On July 9, 1986 bullets earlier recovered by the police in an apartment that the defendant had access to were destroyed.
According to the prosecution, all evidence in the present case was vouchered at the Bronx property clerk’s office for purposes of trial and was labeled as either "investigative” or "property found”. After about IV2 years, the ballistics evidence was destroyed by that office because there had not been an arrest in the interim.
Detective John Hennessey, a veteran police officer for 28 years and a detective for 21 years, said, with respect to his investigation of the homicide on the date of that crime, that he had arrived at the apartment of the defendant and discovered a photograph of one "Boss” (nickname of Morris Brown) and a passport with a photograph purportedly for one "Morris Brown”. Moreover, according to Detective Hennessey, after further investigation, he established that Morris Brown was "Boss”. In response to questioning by this court, Detective Hennessey said that based on identifying the suspect as one Morris Brown and from information he uncovered from the apartment coupled with whatever information eyewitnesses could have given him, he could have asked for an arrest warrant. Detective Hennessey revealed, again in response to questioning by the court, that if he had asked for an arrest warrant that would have caused him to change the classification of the voucher from "found property” to "investigatory”. But, in actuality, Detective Hennessey said that, with regard to assigning a status to that vouchered property under the prescribed words "Charge/Offense Under Investigation” on the voucher form, he left that blank. According to Detective Hennessey, since he had actually found the property in an apartment, he treated it as "found property”.
Sergeant George Kuttler, a veteran police officer for 30 years and a sergeant for 8 years and who is supervisor of the Bronx property clerk’s office (hereinafter Sgt. Kuttler), testified that he supervises the destruction of property in the Bronx property clerk’s office. With regard to the destruction of property classified on a voucher as "arrest evidence”, Sgt. Kuttler testified that police policy requires that property be destroyed only after a release is given by the Bronx District *335 Attorney’s Office. With respect to the destruction of property classified only as "found property”, police policy mandates that it be retained for a period of one year, except if it is "found property” involving a homicide case. Under that circumstance (found property in a homicide case), according to Sgt. Kuttler, that property would be reclassified by his office to "investigatory” and held for about four to five years. More specifically, Sgt. Kuttler revealed that before this type of property is destroyed, his office would contact the department that originally vouchered it. With regard to "found property” in a homicide case wherein the voucher is left blank under the category "Charge/Offense Under Investigation”, Sgt. Kuttler said that he would not know how to treat that. According to Sgt. Kuttler, he probably would handle that destruction in accordance with the policy for destroying "found property”, i.e., retain it for about one year. Hence, in response to questioning by the court, Sgt. Kuttler testified that detectives and officers are required to fill out vouchers with such specificity so that the property clerk’s office can properly perform their function.
ANALYSIS
The issue to be resolved in this matter is whether testimony can be admitted where evidence has been destroyed under these circumstances.
Where discoverable evidence gathered by the prosecution or its agent is lost, the People have a heavy burden of establishing that diligent, good-faith efforts were made to prevent the loss. (People v Kelly, 62 NY2d 516.) In Kelly, the codefendants, acting together, allegedly went up to a decoy police officer posing as a civilian, and after hitting him, stole his wallet containing about $22 in cash. Later, when the defendant sought to examine the evidence which earlier had been vouchered at the property clerk’s office, the defendant was told that the evidence was lost. The defendant moved to dismiss the criminal charges claiming that this lost evidence precluded it from asserting the defense of legal entrapment based on the positioning of the money and the appearance of the money which allegedly had been doctored, i.e., a $1 bill made to resemble a $20 bill. The trial court dismissed the charges and ruled that the missing evidence prevented the defense from cross-examining prosecution witnesses and from establishing legal entrapment as an affirmative defense. That decision was *336 affirmed by the Appellate Term. However, the Court of Appeals reversed the order of the Appellate Term, reinstated the information and remitted the case to the trial court to determine an appropriate sanction for the prosecutor’s failure to preserve evidence.
The Court of Appeals, in short, explicitly recognized a statutory duty on the part of the prosecution to retain possession of discoverable evidence until it is released by court order under CPL 240.20 (1) (e) notwithstanding the prosecution’s argument that the property was lost pursuant to a police department in-house practice to return vouchered property to the decoy officers for future investigative use, and that the People did not intend to harm the defendant. (People v Kelly, supra, at 520.) The Kelly court, with regard to the People’s explanation, stressed that "it falls far short of satisfying the People’s burden of establishing that they are not accountable for the loss.” (People v Kelly, supra, at 520.) That analysis quite clearly seems to contemplate that even if the prosecution argues, here, that property was lost pursuant to a police department procedure in the absence of an intent to harm the individual defendant, that the prosecution is nevertheless accountable for the loss. (See, e.g., People v Haupt, 71 NY2d 929 [a homicide trial commenced 16 years after the crime due to the mental incompetency of the defendant to stand trial wherein the court recognized that even where there is an inadvertent loss of weapons and ammunition by the prosecution which evidence had little relevance to the issue of sanity that courts should examine (1) whether the prosecution was responsible for the loss and (2) whether that loss affected the ability of the defense to conduct cross-examination or to give a summation]; compare with, People v Jenkins, 41 NY2d 307 [a case involving the disappearance of a prosecutorial informant-witness where the prosecution exerted good-faith efforts to make the witness available, wherein the court articulated that if the defense meets the burden of demonstrating relevance and materiality good faith may not be met by the prosecution].) Although the Jenkins decision was made in the context of a missing witness, there is similarity since the defense in the present case has argued that it is prejudiced in defending its client.
At this point, we hold that the prosecution is accountable for the loss of the ballistics evidence. Detective Hennessey testified that when he vouchered the property he classified it as "found property”, i.e., subjecting it to destruction within *337 a one-year period. He also said that if he had asked for an arrest warrant that would have caused him to change the classification to "investigatory”, i.e., exposing it to destruction only upon a release by the District Attorney’s Office. Unfortunately, because the property was classified as "found property” when vouchered and the officer had failed to list a crime on that voucher, the ballistics ammunition was destroyed on July 9, 1986. Thus, the destruction of the evidence was intentional and this is not a case of accidental destruction.
Because, in the instant case, the ballistics evidence technically is discoverable and was requested by the defendant pursuant to a voluntary disclosure request, the principle surrounding the good-faith destruction of property requires some further elaboration since the detriment to the defendant, here, is of an even greater consequence where ballistics evidence purposely has been destroyed in a homicide trial as compared to lost or missing property for another type of crime.
The defense contends that the prosecution mismanaged key evidence which has prejudiced its ability to defend this case. Since the prosecution has offered testimonial evidence that indicates that the only reason this evidence was destroyed is because the officer failed to indicate "homicide” on the voucher form, it is necessary to address the question of whether this type of destruction gives the prosecution a higher burden than good faith where, as is here, the record reflects that the destroyed ballistics evidence was intentionally destroyed even before the defendant was arrested.
In People v Reed (44 NY2d 799, 801), the court suggested that where the prosecution has not sufficiently explained the destruction of property pursuant to statutory procedure there may be a claim of bad faith against the prosecution. In the present case, Detective Hennessey said that he obtained, as evidence, the following items: 9 millimeter bullets, .32 caliber bullets, .44 caliber bullets, and one 30.06 caliber bullet. Detective Hennessey testified that he classified the evidence as "found property” because he had actually recovered it in an apartment. Sergeant George Kuttler testified that with respect to the destruction of "found property” in a homicide case (which is not specified as such when vouchered), that his office would retain that property for a period of time. Accordingly, it would be held for about one year and thereafter destroyed by the property clerk’s office.
*338 Based on this, we do not find a bad-faith destruction of property since the prosecution did make an effort to preserve the evidence. However, clearly, the defendant is prejudiced as a result of the destruction of the ballistics to the extent that he cannot examine the ballistics, since bullets have characteristics unto themselves, to set forth a defense that the bullets recovered and the bullets in the body of the deceased were not of the same make and kind.[3]
The choice of an " 'appropriate’ [sanction] is committed to the sound discretion of the trial court, [and] as a general matter the drastic remedy of dismissal should not be invoked where less severe measures can rectify the harm done by the loss of evidence.” (People v Kelly, 62 NY2d 516, 521.) More specifically, the Kelly court directed that trial courts "[i]n fashioning an 'appropriate’ response to the prosecution’s wrongful failure to preserve evidence * * * [may consider] the degree of prosecutorial fault * * * but the overriding concern must be to eliminate any prejudice to the defendant while protecting the interests of society.” (People v Kelly, supra, at 520; see, e.g., People v Haupt, supra, at 931 [which held that "the (trial) court must consider * * * whether the loss (or destruction of property) was intentional or inadvertent”]; see, e.g., People v Sunset Bay, 67 NY2d 787, 789, citing People v Kelly, supra, at 516, 520, [wherein the defendant claimed that the prosecution’s destruction of the decedent’s pubic hair, after the defendant had pleaded guilty in a homicide case, deprived him of a fair trial, and the Court of Appeals ruled that trial courts must strike "the appropriate balance of eliminating prejudice to the defendant while, at the same time, protecting the interests of society”]; see, e.g., People v Saddy, 84 AD2d 175 [where the court ruled that the degree of negligence on the part of law enforcement may be measured].) Similarly, Federal courts have announced that courts should weigh the degree of negligence involved in the intentional destruction of property.[4]
*339 In the present case, bullets were recovered by the police in an apartment that the defendant had access to. The defendant is not the lessee of record of that apartment. The defendant was a suspect to the homicide on the date of the homicide. The ballistics evidence which was recovered from this apartment should have been safeguarded for purposes of trial. That ballistics evidence was subsequently destroyed on July 9, 1986 by the Bronx property clerk’s office. There is no reason on the record why that evidence was destroyed other than the apparent omission, by the vouchering officer, of the nature of the crime of "homicide” or words to that effect.
Specifically, Detective Hennessey, the officer who vouchered the missing evidence, testified that he is not aware of any policy with regard to changing the status of property after it has been vouchered at the property clerk’s office. Furthermore, Detective Hennessey testified that in this case he could have asked for an arrest warrant and that this would have caused him to change the status of the property from "found property” to "investigatory property”. Hence, according to police department procedure, that property undoubtedly would have been kept until about the latter part of 1988 to 1989 without any disturbance or destruction. Thereafter, the District Attorney’s Office would have been given notice, by the property clerk’s office, enabling the District Attorney’s Office to extend the preservation of that property. Sgt. Kuttler, the supervisor in charge of the property clerk’s office, testified that normally, when property is found in connection with a homicide investigation, the word "homicide” or words tantamount to that should be inserted on the voucher. According to Sgt. Kuttler, police officers and detectives are required to fill out these vouchers with such specificity to enable the property clerk’s office to do its job. Therefore, clearly, Detective Hennessey had a duty to complete that voucher form with specificity. By not listing the pending criminal charge or crime, i.e., homicide, on the voucher, that omission caused the property to be destroyed. Even Sgt. Kuttler testified that if, as in this case, the "found property” notwithstanding the fact that it was ballistics evidence failed to be highlighted by the word "homicide” or words to that effect, it would simply be classi *340 fied as "found property” and, accordingly, destroyed within a one-year period.
Here, the bullets are the most reliable evidence for the defense to make use of in an attempt to establish a defense with respect to a purported difference in ammunition.
The destruction of the evidence precluded the defense from arguing that the .44 caliber bullets that were earlier received and later destroyed were not of the same make and kind as the .44 caliber bullets in the body of the deceased. The remedy to be applied by this court is to preclude the use of testimony about the .44 caliber bullets found in the apartment that the defendant allegedly had access to.

. [1]This court finds that, by interpretation, District Attorneys are public servants. Under CPL 1.20 (32), a "district attorney” means a District Attorney, an Assistant District Attorney or a Special District Attorney, and, where appropriate, the Attorney-General, an Assistant Attorney-General, a Deputy Attorney-General or a Special Deputy Attorney-General.
"The term 'public servant’ is 'defined broadly enough to include not only every category of government or public "officer,” but every "employee” of every such officer or agency, every person specially retained to perform some government service and every person who, though not having yet assumed his official duties, "has been elected or designated to become a public servant.” ’ ” (Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 10.00, at 23, quoting Denzer and McQuillan, Practice Commentary, McKinney’s Cons Laws of NY, Book 39 [1967 ed], Penal Law § 10.00, at 17.)
Thus, since District Attorneys perform a governmental service they are, in effect, public servants.

. The prosecutrix made this statement the day after the trial started, during her opening in which she referred to a statement attributed to the defendant, Morris Brown. More importantly, the prosecutrix failed to inform defense counsel of that prior statement by his client when, in fact, she had an opportunity to do so on the preceding day when another witness statement was first revealed, by her, to defense counsel.

. Of equal significance, during this trial, the People also conceded that the passport of Morris Brown is irretrievably lost.

. Compare with, United States v Bryant, 439 F2d 642, 647 (Jan. 29, 1971) (ruling with regard to the destruction of tape recorded evidence in a narcotics case that "[o]n a spectrum between good faith * * * and bad faith destruction, [the officers’] conduct must lie somewhere in the middle”); compare with, United States v Consolidated Laundries Corp., 291 F2d 563, 570 (2d Cir 1961) (a case involving eight corporations conspiring to restrain interstate commerce in violation of Federal law, and wherein the govern *339 ment negligently suppressed documents during discovery. The court announced that this "failure to produce deprived the defendants of evidence which would have been helpful to them on points * * * of great importance in determining their guilt” and this temporary loss of documents until after the trial "was negligence chargeable to the prosecution”).