*881 OPINION OF THE COURT
John R. LaCava, J.
The defendant is accused by indictment of manslaughter in the second degree and criminal possession of a weapon in the fourth degree.
On September 27, 1989 through September 29, 1989, a combined pretrial hearing was conducted in the above matter to determine the admissibility at trial of an in extremis nonverbal "blinking of eyes” communication by the deceased to an investigating detective.
At the conclusion of the hearing, the court makes the following findings of fact and conclusions of law:
FACTS
On June 3, 1988, Ira Frank, a public safety dispatcher with the Yonkers Police Department, received a telephone call at approximately 3:15 a.m. from an apparently distraught male caller. The caller, when asked what is the matter, stated "I don’t know, we were fooling around with a gun and the gun went off and I [unintelligible] shot somebody.” The dispatcher ascertained, through conversation, that the caller was in a bakery located at 167 Bronx River Road in Yonkers.
At the same time, Police Officer Joseph Tchorzyk was on plain-clothes antiauto theft duty. Officer Tchorzyk was a block to a block and a half away from the Masi Bakery located at 167 Bronx River Road and was dispatched to the bakery.
After entering, Tchorzyk followed the defendant into the rear of the bakery and observed a male, later identified as Frederick Sannicandro, lying on the floor, apparently unconscious, in the fetal position. The defendant then started kicking Mr. Sannicandro three or four times saying "Get up, get up, you’re not hurt.” Officers Tchorzyk and Miller pulled the defendant away from Mr. Sannicandro and restrained and handcuffed him. Meanwhile, other police officers arrived. Mr. Sannicandro was turned onto his back and a bullet wound was discovered in his abdomen.
As previously noted, medical assistance had been summoned for Mr. Sannicandro. Jeffrey Fell, a paramedic for Empress Ambulance Service, testified that the call came in at 3:16 a.m. and that his ambulance arrived at the bakery at 3:22 a.m. Fell proceeded to the back room of the bakery and observed a man on the floor amid a room cluttered with machines and objects. *882 The subject had a penetrating wound to the abdomen right below the diaphragm. The wound was covered with an occlusive dressing and various observations of the patient’s condition were made.
The paramedic determined that Mr. Sannicandro had no pulse at his wrist and that a pulse obtained at midarm indicated a reading of "60 by palpitation” which was very low or "poor” in comparison with what would constitute a normal blood pressure of "135/80” for a person of Mr. Sannicandro’s size and weight. The subject appeared to be in severe stress and his rapid and shallow respiratory rate, pale skin color and the delayed capillary refill of his fingertips indicated that he was in severe and decompensated shock. The subject made moaning noises and was otherwise nonverbal. He did not respond to attempts to communicate with him and would not move extremities (arms) on command. His distended abdomen indicated severe internal bleeding. A "Glascow Coma Scale” of "10” based upon spontaneous eye openings, nonverbal sounds and aspects of his motor responses indicated "poor mental ability”. His "Trauma Score” of "9”, based on a number of factors including his respiratory rate, blood pressure, use of accessory muscles, and capillary refill ability indicated a "poor survivability potential”.
Three I.V.’s were started, oxygen was administered and inflatable pants were placed on the subject to keep blood from circulating to the lower extremities and to perfuse or enhance blood flow to his vital organs. A tube was attempted to be inserted from his nose to his trachea and as a result of the irritation of the various procedures and movement, breathing may have been stimulated. Mr. Fell was not able to assess the subject’s level of consciousness throughout his tenure with him.
The patient left the bakery at 3:35 a.m. and arrived at the hospital at approximately 3:43 a.m. At an emergency room, he was intebated orally by the doctor.[1] As a result of his breathing being assisted, Mr. Sannicandro’s blood pressure improved, but Dr. Peter W. Voges, a surgeon who was on call and who assisted in this case, described the patient’s blood pressure as "poor”. Dr. Voges arrived at the hospital at approximately 4:00 a.m. and examined Mr. Sannicandro. He observed a patient who was "in extremis”, intebated, with two I.V.’s and *883 with an extended abdomen. The patient had lost between 3 and 3Vi liters, or approximately 60% of his blood and the surgeon testified that during surgery because of the blood dropped in Mr. Sannicandro’s abdomen, he was "soaked up to my knees in blood.” Approximately nine liters of I.V. liquid was secreted into the patient’s system to compensate for the massive loss of blood.
Dr. Voges determined that the patient was in immediate need of surgery to save his life. At this time, the doctor had expectation of saving the patient’s life. The patient was now conscious and Dr. Voges explained to him that he was bleeding internally because of the wound received, that the doctor would do his best to control the bleeding, that immediate surgery was necessary and that he would make arrangements as soon as possible for the operation. Dr. Voges testified that Mr. Sannicandro, although unable to speak, indicated that he clearly understood what was proposed to him and indicated affirmatively that he consented to the surgery. Upon cross-examination, the doctor held to this opinion even though it was posited to him that the patient may have had a blood alcohol level of .12 or more.[2] Dr. Voges never thought the patient was intoxicated when he spoke to him, and although professing to not being an expert on the effects of intoxication, felt that a patient intoxicated to that level was still able to make a valid judgment.
At approximately the same time or shortly after. Dr. Voges arrived at the hospital, Detective James Trotta also arrived. Jeffrey Fell was still at the hospital and was observing the events. Right after the doctor spoke to him, Detective Trotta approached and asked if he could speak to the fellow who was shot. Dr. Voges said "You can speak to him for a minute.” Dr. Voges saw Detective Trotta approach the patient and then left to make arrangements for surgery.
Detective Trotta noticed that Mr. Sannicandro appeared to be "pale” and "in pain”. Because he was intebated and could not verbally speak (because of the tube going down his throat) the detective took the following approach and tact. He told Mr. Sannicandro that he was a police officer and was going to ask him some questions — if the answer was "yes” blink once, *884 if the answer was "no” blink twice. Detective Trotta then said "Freddie, can you hear me — if you can hear me blink once.” At this point Mr. Sannicandro blinked once according to Detective Trotta. He asked Mr. Sannicandro if Frank shot him. In response, Mr. Sannicandro blinked once. Detective Trotta then asked whether it was an accident. In response, Mr. Sannicandro blinked his eyes two times. Mr. Sannicandro then closed his eyes and apparently lapsed into unconsciousness.
Jeffrey Fell was present at the hospital during these occurrences. He recalled the detective setting up a system where the victim could answer by blinking and that a coding system was established. The blinking seemed "pretty deliberate” and Mr. Fell recalls that the patient indicated that he had not been shot by accident.
Mr. Sannicandro barely survived surgery and was taken to the intensive care unit. He had suffered a massive loss of blood from penetration of the lung and intercostal artery. Half of his liver had been destroyed. He died at approximately 10:30 a.m.
THE DYING DECLARATION AND EXCITED UTTERANCE ISSUES: CONCLUSIONS OF LAW
The defendant strenuously objects to the admissibility at trial of Detective Trotta’s testimony regarding Mr. Sannicandro’s nonverbal "blinking” communication either under the dying declaration or excited utterance exceptions to the hearsay rule.
Although the "statements” may have been in extremis declarations by Mr. Sannicandro, there is nothing in the record to show that he was under a sense of impending death and/or without any hope of recovery (People v Allen, 300 NY 222; People v Ludkowitz, 266 NY 233). In fact, the attending physician, Dr. Voges, had every hope and expectation of saving Mr. Sannicandro’s life by surgery and never said anything to the contrary when he informed him of the necessity of an operation. We will simply never know whether Mr. Sannicandro realized how seriously he was injured by the gunshot wound. The communications to Detective Trotta do not therefore constitute dying declarations and are not admissible under that theory as an exception to the hearsay rule.
The question of whether the communications are admissible *885 as excited utterances is more difficult to determine and requires the consideration of a number of issues which appear to be matters of first impression.
The defendant argues that this case should not be the vehicle with which to expand the excited utterance exception to the hearsay rule for a number of reasons. No other case has ever held that an intoxicated person can make an excited utterance. No other case has ever determined that a person who was incapable of speech because of his physical condition could make an excited utterance. No other case has held that a person with a criminal record including a felony conviction for criminal possession of a weapon and who was possibly subject to further criminal charges and incarceration as a result of his actions (e.g., criminal possession of a loaded firearm) and who had the motive and means to fabricate for his own self-interest could make an excited utterance. In short, it is argued that no other case has ever held that there could be an excited utterance in light of the above circumstances which individually and collectively render the blinking communications by Mr. Sannicandro unreliable and therefore not admissible for consideration by the jury.
The court disagrees and finds that Mr. Sannicandro’s statements made by way of a deliberate blinking of his eyes at a time when he was incapable of verbally communicating are admissible.
As to the fact that Mr. Sannicandro’s message was delivered by the blinking of his eyes, the court finds that People v Madas (201 NY 349), albeit dealing with a dying declaration, is both relevant and instructive. In that case, the victim made an antemortem statement although unable to speak by reason of a tube placed in his wind pipe which enabled him to breath following an operation occasioned by a gunshot wound to the neck. He answered questions by a nod or shaking of his head, was conscious and intelligent and comprehended what was said to him. He identified the defendant as the person who shot him by pointing to him with his hand. The court found that the declaration of the deceased, although made by acts instead of by words, was competent as a dying declaration. The rule has been stated as follows: "Nonverbal conduct as well as oral or written declarations may fall within the hearsay prohibition. An act performed solely for the purpose of communicating, such as pointing or nodding, is equivalent to a verbal statement and thus clearly can be stigmatized as hearsay.” (Fisch, New York Evidence § 759, at 450 [2d ed].)
*886 Dr. Voges, the attending physician and surgeon in this case, testified that he examined Mr. Sannicandro a few moments before Detective Trotta spoke to him. The patient was conscious and the need for an operation was explained to him. Although unable to speak, Mr. Sannicandro clearly understood what was proposed to him and indicated affirmatively that he consented to the surgery. The doctor felt that it would have been difficult for the defendant to have moved his head and Jeffrey Fell, the paramedic, had no indication as to whether Mr. Sannicandro could shake his head. Under the circumstances, establishing a "blinking” communication system was an appropriate way for Detective Trotta to secure a statement. As to the argument that the blinking code was not sufficiently tested and verified before the vital questions were posited to Mr. Sannicandro, the court notes that Detective Trotta was told by Dr. Voges "you have a minute” when he asked for permission to speak to the patient. To Detective Trotta, Mr. Sannicandro appeared pale and in pain. He explained who he was and that he wanted to ask some questions. He explained the code by stating "if the answer is 'yes’, blink once and if the answer is 'no’, blink twice.” He confirmed the code by observing Mr. Sannicandro blink once. The code was further confirmed by Mr. Sannicandro’s blinking once when asked if the defendant shot him and twice when asked whether it was an accident. No further questioning was possible at this time because the victim lapsed into unconsciousness. Jeffrey Fell was present at this time and confirmed that the blinking appeared deliberate and he recalls that the patient indicated that the shooting was not accidental.
At this point, it may be noted that the questioning took place by all indications within a half hour of Mr. Sannicandro’s arrival at the hospital. Prior to his arrival at the hospital, there is no indication that he ever regained consciousness. In People v Brown (70 NY2d 513), the Court of Appeals found that the sudden and violent nature of the event, the mortal wounds inflicted, the extreme pain and the unrelenting physical and emotional trauma caused thereby were all indications that the shooting of the victim even after 30 minutes was under the influence of the stress of excitement precipitated by an externally startling event. In People v Brooks (71 NY2d 877), the court found that the declarant’s statements qualified as excited utterances even though a period of 2 to 2 Vz hours had passed since the shooting and the victim had faded in and out of consciousness.
*887 Nor does this court believe that evidence that Mr. Sannicandro may have been intoxicated render the statements unreliable. Neither Jeffrey Fell nor Dr. Voges observed any external signs of intoxication. Dr. Voges testified that Mr. Sannicandro was conscious and understood what was told to him. In addition, Dr. Voges rendered an opinion at the hearing that even though Mr. Sannicandro probably had a blood alcohol level significantly in excess of .12, that he still would be able to make a valid judgment. The court notes that the law does not presume that one who is suspected of or reasonably believed to be intoxicated is incapable of being questioned, of understanding rights or of making valid judgments and giving competent testimony (see, People v Barksdale, 100 AD2d 852; People v Stroud, 34 AD2d 1047; see also, People v Durante, 48 AD2d 962; People v Nolan, 75 AD2d 828). The mere presence of intoxication does not therefore render a statement inadmissible but may affect the weight which the trier of fact attaches to it.
The argument is made that Mr. Sannicandro had a prior felony conviction for criminal possession of a weapon. He also had numerous other arrests and convictions for an assortment of crimes. He therefore knew or should have known that he could be charged with felony possession of a loaded gun and that with his prior record, he was facing a substantial jail sentence. Mr. Sannicandro therefore had a tremendous motive to lie and blame the defendant for the shooting. His statement was self-serving and unreliable and should not be submitted to the jury.
The court rejects this argument and finds that it may affect the weight but not the admissibility of the evidence. The evidence shows that Mr. Sannicandro was shot and mortally wounded in Masi’s bakery. The police were summoned and medical assistance was ordered when the wounded man’s condition was ascertained. He was in shock, unconscious, and moaning constantly until arrival at the hospital. Sometime after admission, he regained consciousness and awoke to find himself in a hospital, aspirated, and with multiple I.V.’s going into his body. Almost immediately thereafter, a doctor explained to him that he would have to have surgery to save his life because of the extreme loss of blood and the serious nature of his wound. He was asked whether he consented to an operation. A detective then identified himself and told him to answer by blinking his eyes to indicate "yes” or "no”. The *888 court finds that at that moment, the possibility that Mr. Sannicandro would have considered that he might be the target of an investigation or subject to criminal prosecution is patently remote. But that is not the test. As stated in People v Brown (70 NY2d 513, 519, supra), " '‘Above all, the decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection’ The court finds because of the sudden and violent nature of this shooting, the mortal wounds inflicted, and the apparently unrelenting physical and emotional trauma, that the nonverbal communications by Mr. Sannicandro were not "made under the impetus of studied reflection” and qualified as excited or spontaneous utterances. As such they are admissible as exceptions to the hearsay rule. The court further finds that the arguments proffered by defendant, when considered collectively, do not render the declarations so unreliable as to bar their consideration by the trier of fact and render them inadmissible at trial.

. Mr. Fell testified that this meant that a tube was inserted from his mouth to his trachea in order to assist his breathing.

. At the hearing, it was stipulated that the Medical Examiner determined Mr. Sannicandro’s blood alcohol level to be .12 based upon a sample of blood drawn from the body. His blood alcohol level was probably significantly higher upon his admission to the hospital.